**Martin John BEATTIE, et al.**

v.

**UNITED STATES of America,
Appellant.**

No. 84–5413.

United States Court of Appeals,
District of Columbia Circuit.

Argued 31 Oct. 1984.

Decided 31 Dec. 1984.

Dissent and Concurrence Filed
26 Feb. 1985.

As Amended 26 Feb. 1985.

Scalia, Circuit Judge, filed dissenting opinion.

Wald, Circuit Judge, filed concurring opinion.

Gary W. Allen, Asst. Director, Torts Branch, U.S. Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., U.S. Dept. of Justice, and Joseph E. diGenova, U.S. Atty., Washington, D.C., were on brief for appellant.

Philip Silverman, Washington, D.C., with whom Juanita M. Madole, Washington, D.C., was on brief for appellee.

Before WALD and SCALIA, Circuit Judges, and WILKEY, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge WILKEY.

Opinion dissenting filed by Circuit Judge SCALIA.

Opinion concurring filed by Circuit Judge WALD.

WILKEY, Senior Circuit Judge:

This case arises out of the crash of an Air New Zealand aircraft into Mount Erebus, Antarctica, on 28 November 1979. All

persons on board were killed. On 12 January 1983 plaintiffs filed a complaint in the United States District Court for the District of Columbia, seeking recovery against the United States for wrongful death under the Federal Tort Claims Act (FTCA).[1] Plaintiffs' amended complaint ultimately alleged negligence of United States Navy Air Traffic Controllers at McMurdo Naval Air Station, Antarctica, as well as negligence in the selection, training, and supervision of the navy personnel at McMurdo Base by officials of the Department of Defense.

The United States filed a motion to dismiss under Rule 12(b)(1), (3), and (6), claiming that the District Court lacked subject matter jurisdiction, that plaintiffs had failed to state a cause of action upon which relief could be granted, and that venue was improper. The primary basis for the motion was the "foreign country" exception to the Federal Tort Claims Act.[2] This exception removes from the scope of the FTCA "[a]ny claim arising in a foreign country."[3]

The issue before the District Court was one of first impression: Is Antarctica, a continent which is not now subject to the sovereignty of any nation, a "foreign country" within the meaning of the FTCA? By interlocutory order on 25 June 1984 the District Court denied the government's motion to dismiss, 592 F.Supp. 780, and certified this case for consideration by this Court in conformity with 28 U.S.C. § 1292(b). The government sought permission to appeal, which we granted.

To resolve the question before us, we must deal with three broad issues. The first issue is whether the District Court has subject matter jurisdiction. This issue hinges on a determination of whether Antarctica is a foreign country within the meaning of the FTCA. The second issue is whether the venue rules of the FTCA have been satisfied. The final issue involves a determination of which forum's law to apply. Our analysis of these issues leads us to affirm the interlocutory order of the District Court.

## I. SUBJECT MATTER JURISDICTION

### A. *The Exception of Section 2680(k)*

The FTCA acts as a waiver of sovereign immunity in specified types of cases. Section 2680 of the FTCA lists several exceptions to that waiver. One of those retentions of sovereign immunity is involved here: section 2680(k), which withholds FTCA jurisdiction from "[a]ny claim arising in a foreign country."[4] As previously noted, the question of whether the District Court has subject matter jurisdiction depends on whether Antarctica is a foreign country within the meaning of the FTCA.

#### 1. The Nature of Antarctica

Antarctica can properly be characterized as something of an international anomaly. It is a large continent which has never been and is not now subject to the sovereignty of any nation. Under the Antarctica Treaty of 1959 the signatory nations agreed not to exercise sovereignty in Antarctica, although their claims to sovereignty were not extinguished.[5]

The United States currently operates four active year-round stations, several summer camps, and numerous temporary tent cities in Antarctica.[6] McMurdo Base is America's largest station, with a summer population in excess of 850 persons and a winter population of about 92. It consists of approximately 130 buildings. McMurdo Station has been assigned a zip code by the United States Postal Service.[7]

---

1. 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1982).

2. 28 *id.* § 2680(k) (1982).

3. *Id.*

4. *Id.*

5. The Antarctica Treaty, 12 U.S.T. 795, T.I.A.S. No. 4780, Appendix at 55–60.

6. National Science Foundation, *Facts About the United States Antarctic Research Program* 1–3 (July 1984).

7. *Id.* The United States Postal Service Zip Code Directory 1984. The zip code listed is 96692.

McMurdo Station has an airfield which supports frequent flights to and from New Zealand during the Antarctic summer. The airfield has two air traffic control facilities. One is Ice Tower; it is located adjacent to the runway, and has radio communication capability with incoming aircraft. The second facility is Mac Center, which has both radio capability to communicate with aircraft and radar capability to locate aircraft via radar returns.[8]

These United States activities are not set forth to demonstrate that, by virtue of extensive involvement, the United States can bring some distant land within the scope of United States sovereignty. These activities are relevant only to a fairly narrow and straightforward issue—is Antarctica a foreign country? The answer to this question is determined in part by answering the question of whether the United States treats this admittedly sovereignless land like a foreign country. The answer is that it does not.

During the pendency of the Antarctica Treaty the United States has consistently reaffirmed its position regarding Antarctica. In 1981, for example, Assistant Secretary of State James L. Malone reiterated that, while the United States does not recognize territorial sovereignty in Antarctica, it maintains its own basis to claims of sovereignty in Antarctica.[9]

 Based on the foregoing information, and on a common sense approach to the plain language of the statute, it would appear obvious that Antarctica is not a foreign country within any ordinary meaning of that term. That sort of "plain meaning" approach formed part of the basis of the District Court's decision. As the District Court explained:

In view of this status of Antarctica, if the words of the statute are to be the decisive guide to statutory interpretation, the government's motion must fail, for clearly the instant claim did not arise in a foreign country as that term is commonly understood. Antarctica is not a foreign country; it is not a country at all; and it is not under the domination of any other foreign nation or country. Thus, if it be deduced from the language of the law that the section 2680(k) exception applies only where the government of a foreign nation has or asserts sovereignty, the Court would have to hold that with respect to Antarctica the exception does not, and the Act does, apply.[10]

Reference to the legislative history and relevant case law illustrates that Congress did not intend the term "foreign country" to extend beyond its ordinary meaning.

2. The Legislative History

The FTCA was the product of many years of congressional drafting and redrafting. A variety of amendments were proposed to the original legislation, including several different ways to structure the foreign country exception. A look at some of the rejected language highlights the meaning which should be given to the version which was eventually passed. In 1940 language was proposed to the foreign country exception which would have delineated the geographical jurisdiction of the FTCA to approximately the area the government now contends is covered, and by a positive inclusion instead of the negative exclusion we now have. The suggested language read:

(12) This act shall be applicable only to damages or injury occurring within the geographical limits of the United States, Alaska, Hawaii, Puerto Rico or the Canal Zone.[11]

**8.** National Science Foundation, *supra* note 6, at 1.

**9.** *Hearings Before the Subcommittee on Arms Control, Oceans, International Operations and Environment, of the Senate Committee on Foreign Relations,* 97th Cong., 1st Sess. (1981) (testimony of Ass't Sec. of State James L. Malone).

**10.** Appendix at 42 (Mem.Op. by Harold Greene, J.) (citations omitted).

**11.** *Hearings on S. 2690 Before a Subcommittee of the Senate Committee on the Judiciary,* 76th Cong., 3d Sess. 38 (1940).

Obviously, this language, if it had been accepted, would have limited the geographic jurisdictional scope of the FTCA to what the government now says it is. In fact, even if such language had never been suggested in the legislative history, the government would be hard put now to explain why, if the intent was to confine the FTCA solely to the geographical United States, the statute did not use straightforward language such as, "the applicability of the FTCA is limited to United States territory," or, "limited to claims arising in this country." However, no such language was accepted, and the previous "foreign country" version was retained.[12] We find it persuasive that *Congress did not place a strict geographical limit on the scope of the FTCA, preferring simply to make an exception in the case of foreign countries.*

One instructive item of legislative history was highlighted in the only Supreme Court case to interpret this section of the FTCA, *United States v. Spelar*.[13] The Court quoted a pertinent colloquy between Assistant Attorney General Francis M. Shea, testifying to the House Committee on the Judiciary, and Congressman Robson of that Committee.

> Mr. Shea: Claims arising in a foreign country have been exempted from this bill, H.R. 6463, whether or not the claimant is an alien. Since liability is to be determined by the law of the situs of the wrongful act or omission, it is wise to restrict the bill to claims arising in this country. This seems desirable because the law of the particular State is being applied. Otherwise, it will lead I think to a good deal of difficulty.
>
> Mr. Robson: You mean by that any representative of the United States who committed a tort in England or some other country could not be reached under this?

Mr. Shea: That is right. That would have to come to the Committee on Claims in the Congress.[14]

Although Mr. Shea did testify that it would be "wise to restrict the bill to claims arising in this country," the entire basis for that statement was his premise that liability is to be determined by the law of the situs of the wrongful act or omission.[15]

■ It should be noted that in examining legislative history, one is justified in placing greater reliance on the exact choice of words in the bill as enacted than in oral testimony to a committee hearing. Mr. Shea's words must be given their general intent, which is that liability based on the law of a foreign country was to be avoided.

Although the legislative history does not point decisively to any answer, the weight of the evidence is in favor of the concept that Congress did not intend to limit the application of the FTCA to the United States and its territories and possessions. It had the opportunity to do so and chose to retain only the "foreign country" limitation. Rather, the legislative will seems to be as the Supreme Court summarized it in *Spelar*, that "though Congress was ready to lay aside a great portion of the sovereign's ancient and unquestioned immunity from suit, it was unwilling to subject the United States to liabilities depending upon the laws of a foreign power."[16]

3. Cases Interpreting Section 2680(k)

The only Supreme Court case to interpret § 2680(k) is *United States v. Spelar*.[17] That case involved a suit for wrongful death arising out of the death of a flight engineer at a United States Air Base in Newfoundland, leased by the United States from Great Britain. The Supreme Court determined that even though the accident occurred on a United States Base, that the

---

**12.** *See Tort Claims Against the United States: Hearings on H.R. 7236 Before Subcommittee No. 1 of the House Judiciary Committee,* 76th Cong., 3d Sess. 3 (1940).

**13.** 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949).

**14.** *Id.* at 221, 70 S.Ct. at 12.

**15.** *Id.*

**16.** *Id.*

**17.** 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949).

negligent acts complained of nevertheless arose in a foreign country. The law which would have been applied to the case was the wrongful death law of Newfoundland. The holding of *Spelar* is based on the principle that § 2680(k)'s purpose is to prevent the United States from being subject to "liabilities depending upon the laws of a foreign power," [18] and that the mere presence of United States government activities *in a foreign country* will not convert that portion of the foreign country into something else.

Both parties in this proceeding cite a wealth of lower federal court cases relating to the issue of jurisdiction. Since the issue in this case is one of first impression, none of the cases can be said to be truly on point. However, these cases are instructive and stand for several helpful propositions.

### B. *Operative Effect Cases*

Several cases have determined that a claim arises where the act or omission complained of occurs.[19] Thus, a large body of the cases cited in the briefs illustrate that an FTCA claim may arise in the United States, because the negligent act or omission occurred here, even though the act or omission had its "operative effect," i.e., the injury occurred, in a foreign country.[20]

For example, in the case of *Sami v. United States*[21] an Afghanistani economist was arrested by German police in Germany, at the request of the United States representative for Interpol. Mr. Sami had fled to Germany with his children as a result of a child custody dispute. He sued the United States for false arrest after the State Department told Germany that the offense was not extraditable.[22]

The District Court dismissed the case as one arising in a foreign country, because the last event necessary to liability had occurred in Germany. This Court responded that the FTCA focuses on the place where the negligent or wrongful act or omission of the government employee occurred. Since the instructions to make the arrest and most of the other operative facts in *Sami* occurred in the District of Columbia, this Court determined that § 2680(k) was not a bar, because the case actually arose in the United States.

These operative effect cases relate not so much to the definition of "foreign country," but to the meaning of "arising in." They determine that "arising in" does not necessarily refer to the situs of the injury, but to the situs of the negligence. The operative effect cases support subject matter jurisdiction over a portion of the plaintiffs' claims in this case, those which have been characterized as the "headquarters claims."[23] The headquarters claims are the allegations of negligent selection, training, and supervision of the McMurdo Air Traffic Controllers by officials in Washington, D.C. Since these claims allege negligent acts or omissions by government employees which occur within the United States, and which merely had their operative effect in Antarctica, they are not claims which "arise in" a foreign country. However, the operative effect cases do not support subject matter jurisdiction over the claims of negligence by the air traffic controllers at McMurdo Base, Antarctica. These "Antarctica claims" constitute a separate ground for relief, with the negligent acts or omissions complained of occurring in Antarctica.

Thus, we accept for present purposes the validity of the headquarters claims, as we

---

18. *Id.* at 221, 70 S.Ct. at 12.

19. *See, e.g., Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979) ("[T]he FTCA, for purposes of imposing liability, focuses on the place of the government employee's act or omission.").

20. *See, e.g., id.; Leaf v. United States,* 588 F.2d 733 (9th Cir.1978); *In re Paris Air Crash of*

*March 3, 1974,* 399 F.Supp. 732, 737 (C.D.Cal. 1975).

21. 617 F.2d 755 (D.C.Cir.1979).

22. *Id.* at 758.

23. Brief for Appellees at 33.

must on appeal of a Rule 12(b) motion.[24] Doing so does not eviscerate the jurisdictional bar of the foreign country exception, as the government fears. For one thing, it has always been possible to allege headquarters claims in cases involving injury in a foreign land. But unless subject matter jurisdiction can be separately established for those claims truly arising in a foreign country, the parties would be left with the headquarters claims as their entire case. Since, with the exception of international anomalies such as Antarctica, those claims would be barred by § 2680(k), it is seldom worth their while to try to make a case live or die on the basis of headquarters claims standing alone.

## C. *The Foreign Country Cases*

A variety of cases have been cited which merely decide that, despite outward appearances, the situs of the acts or omissions was a foreign country. For example, torts occurring on American embassies or military bases which are located in foreign countries are barred by the foreign country exception.[25] This is also related to the idea that embassies and military bases in foreign countries often operate under agreement to apply that foreign country's laws in cases occurring there.[26]

A variety of other cases make subtle distinctions as to the level of sovereignty existing in some foreign land. For example, in *Burna v. United States*,[27] an FTCA case in post World War II Japan, the court concluded that, while the applicable treaty conferred some authority over Okinawa to the United States, Okinawa was still a foreign country within the meaning of the FTCA. This and other vestiges of sovereignty in Japan led the court to conclude that the foreign country exception applied. In *Cobb v. United States*,[28] the court's extensive analysis led it to the conclusion that Japanese tort law would be applicable. The court determined that Okinawa was in a foreign country because of the fact that the United States Military Government was not free to alter the tort law of Okinawa at will but was bound to maintain the preexisting "foreign law." As the court concluded, "[s]ince Congress was unwilling to subject the United States to liability based on that sort of law, the action was properly dismissed."[29] Since Antarctica, by agreement, is not now and never has been subject to the sovereignty of any nation, the present case does not require such an analysis.

From this wealth of cases, plaintiffs have selected one case as that "most closely analogous to the present litigation,"[30] the case of *In Re "Agent Orange" Product Liability Litigation*.[31] In *Agent Orange*, Vietnam veterans, their spouses and children brought suit under the FTCA for alleged injuries incurred from exposure of the servicemen to the herbicide Agent Orange while they were stationed in Vietnam. The claims brought by the servicemen were dismissed pursuant to the doctrine enunciated in *Feres v. United States*.[32] However, the independent claims of the wives and children were permitted to proceed. The government put forth several grounds for dismissal, one of which was the foreign country exception, since the alleged injuries occurred in Vietnam. In examining the foreign country exception, Judge Wein-

---

**24.** *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

**25.** *See, e.g., United States v. Spelar*, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949); *Broadnax v. United States*, 710 F.2d 865 (D.C.Cir.1983); *Meredith v. United States*, 330 F.2d 9 (9th Cir.1964).

**26.** North Atlantic Treaty Organization Status of Forces Agreement, 19 June 1951, art. VIII, 4 U.S.T. 1792, T.I.A.S. No. 2846, 199 U.N.T.S. 67.

**27.** 240 F.2d 720 (4th Cir.1957).

**28.** 191 F.2d 604 (9th Cir.1951).

**29.** *Id.* at 611.

**30.** Brief for Appellees at 13.

**31.** 580 F.Supp. 1242 (E.D.N.Y.1984), *aff'd*, No. 84–381 (2d Cir. 25 Sept. 1984).

**32.** 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

stein, "[a]t the peril of restating the obvious," stated that "the purpose of the exception, then, is to ensure that 'the United States [is not subject] to liabilities dependent upon the laws of a foreign power.' "[33] He went on to say that

> [t]he purpose of the "foreign claim" exception does not apply to this litigation: not only have none of the parties contended that foreign law should be applied, but there is no theoretical justification for application of foreign law.... The jurisdiction where most of the use of herbicides took place, South Vietnam, no longer exists and Cambodia appears to be an independent state in name only now taken over by Vietnam. North Vietnam, the jurisdiction that has replaced South Vietnam and Cambodia, was at war with the United States and it was in the prosecution of the war that the exposure to Agent Orange took place.[34]

Because of the procedural posture of the case, the judge noted that "[i]t is unclear at this point if the decisions relating to that misuse took place in the United States or Vietnam.... There is no reason to attribute those mistakes to Vietnam rather than to the United States and no policy reason to apply the 'foreign claim' exception."[35]

The exact reason for the court's decision that the foreign country exception did not bar the case is not clear from the language of the opinion. The court appears to have been influenced by cases such as *Sami*,[36] an operative effect case, and yet it was also clearly influenced by the apparent lack of sovereignty in South Vietnam and Cambodia. *Agent Orange*, like the present case, involved an undetermined mix of acts or omissions, some occurring within the United States and others in a distant land, all contributing to the harm complained of. *Agent Orange* supports the proposition that § 2680(k) is not a bar to jurisdiction over cases arising at least in part outside the United States, and in areas where "there is no theoretical justification for application of foreign law."[37]

For all of the above reasons, we conclude that the District Court has jurisdiction over this case. Congress, in drafting and passing section 2680(k), only intended to exclude foreign countries from the scope of the FTCA.

## D. *Analogous Statutes and Cases*

■ Plaintiff also lists a potpourri of cases and statutes which have decided, in other contexts, that Antarctica was not a foreign country or a foreign state. By themselves, none of these cases would be persuasive, since they all involve interpretations of other statutes with other purposes. "Foreign country" is a fluid concept and Congress is capable of defining it very differently for different reasons. In addition, waiver of sovereign immunity is not to be inferred lightly. But these cases have a cumulative effect which is persuasive. They demonstrate that across a broad scheme of regulations Congress and the courts have consistently determined that Antarctica does not satisfy any definition of "foreign country."

For example, in *Larry R. Martin v. Commissioner*[38] the Tax Court held that Antarctica was not a foreign country within the meaning of income tax regulations[39] which define "foreign country" as follows:

> The term "foreign country" means territory under the sovereignty of a government other than that of the United States and includes the air space over such territory. It does not include a possession or territory of the United States.

---

**33.** 580 F.Supp. at 1254.

**34.** *Id.*

**35.** *Id.* at 1255.

**36.** *Sami v. United States,* 617 F.2d 755 (D.C.Cir. 1979).

**37.** 580 F.Supp. at 1254.

**38.** 50 T.C. 59 (1968).

**39.** Treas.Reg. § 1.911.1(a)(7) (in effect at the time of the *Martin* case).

The Tariff Act of 1930,[40] the Interstate Transportation of Wagering Paraphernalia Act,[41] and the State Conducted Lotteries Act [42] each defined "foreign country" as "any empire, country, dominion, colony, or protectorate, or any subdivision or subdivisions thereof (other than the United States and its possessions)." The International Flight Information Manual, published by the Federal Aviation Administration, does not list Antarctica in its designations of "foreign countries" in international aviation.[43] As previously noted,[44] the McMurdo Station has been assigned a zip code by the United States Postal Service. United States dollars are the currency of exchange at McMurdo Base, and to obtain dollars to spend at McMurdo, New Zealanders must apply for permits to export money from New Zealand.[45]

As Judge Greene noted, "to the extent that there is any assertion of governmental authority in Antarctica, it appears to be predominantly that of the United States. The United States conducts all search and rescue operations in Antarctica and, significantly, it controls all air transportation." [46]

### E. *The Analogy to Outer Space*

The legal status of Antarctica has been most frequently analogized to outer space.[47] United States spokesmen suggested the 1959 Antarctic Treaty as a possible model for an outer space treaty during initial formulation discussions in 1965 and 1966.[48] Obviously, the provisions of a treaty relating to outer space are only relevant to the present case by analogy. However, they are instructive as to the way in which the United States has acted with reference to sovereign immunity and liability for acts of its agents in a context very similar to Antarctica.

The Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies [49] [the Space Treaty], was signed at Washington, London, and Moscow on 27 January 1967, and entered into force on 10 October 1967. By the terms of the treaty, the United States has agreed to be internationally liable for its space objects and retain jurisdiction over its own objects and persons.

For example, Article VII of the Space Treaty provides:

> Each State Party to the Treaty that launches or procures the launching of an object into outer space ... and each State Party from whose territory or facility an object is launched, is internationally liable for damage to another State Party to the Treaty or to its natural or judicial persons by such object.... [50]

In addition, Article VIII of the Space Treaty provides

> A State Party to the Treaty on whose registry an Object launched into outer space is carried shall retain jurisdiction over such object, and over any personnel thereof, while in outer space or on a celestial body.[51]

---

40. 19 U.S.C. §§ 1336(h)(3), 1338(i) (1982).

41. 18 *id.* § 1953(d).

42. *Id.* § 1307(c).

43. *See* Brief for Appellees at 24 n. 22.

44. *Supra* p. 93.

45. *See* Brief for Appellees at 7.

46. Appendix at 47 (Mem.Op. by Harold Greene, J.).

47. I.A. CSABAFI, THE CONCEPT OF STATE JURISDICTION IN INTERNATIONAL SPACE LAW 66 (1971); *see also* McDougal, Lasswell, Vlasic & Smith, *The Enjoy-* ment and Acquisition of Resources in Outer Space, 111 U.PA.L.REV. 521, 589 (1963); Comment, *Report of the National Citizen's Commission on Space, presented to the White House Conference on International Cooperation,* Nov. 1965, 53 AM.J.INT'L L. 121, 126–31 (1959).

48. *See* Brief for Appellees at 29 (citing S.H. LAY & H.J. TAUBENFELD, THE LAW RELATING TO ACTIVITIES OF MAN IN SPACE 59–60 (1970)).

49. 18 U.S.T. 2410, T.I.A.S. 6347, 61 U.N.T.S. 205 (1967).

50. Appendix at 57.

51. *Id.* at 57–58.

The Space Treaty is obviously not couched in terms of tort claims. However, the basic principle is that in the sovereignless reaches of outer space, each state party to the treaty will retain jurisdiction over its own objects and persons. Like the decisions under the statutes discussed in section D above, holding that Antarctica is not a "foreign country" for various purposes, the treatment of outer space is persuasive by analogy.

## II. VENUE

Venue of cases under the FTCA is governed by the provisions of 28 U.S.C. § 1402, which provides that any such "civil action on a tort claim against the United States ... may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." [52] Since the plaintiffs in this case are all residents of Great Britain or New Zealand, venue must be satisfied through the place of the act or omission. This would be true even if the plaintiffs were *American citizens resident in New Zealand,* which brings into stark relief the state of utter lawlessness which would be created in Antarctica by adoption of the government theories.

■ Plaintiffs have posited two separate grounds for relief, which may be characterized as the headquarters claims and the Antarctica claims. The headquarters claims alleged negligence by officers of the United States, occurring in Washington, D.C., and in the Pentagon. On their face, the headquarters claims satisfy the venue requirements of section 1402(b). Of course, we must analyze these claims under the settled rule for assessing the pro-

priety of dismissal under Rule 12(b) of the Federal Rules of Civil Procedure. Many potentially dispositive facts are intensely disputed by the parties. Because there has been neither factfinding by the district court nor very much if any discovery by the parties, we must accept as true all of the material allegations in the plaintiffs' complaint. Dismissal for failure to state a claim for relief is proper only when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [53] All factual doubts must be resolved and all inferences made in favor of the plaintiffs.[54] On that basis, it is clear that the headquarters claims satisfy the requirements of section 1402(b) by complaining of acts or omissions within the jurisdiction of the District Court for the District of Columbia.

This leaves us with the claims involving negligence in Antarctica. These claims satisfy the venue requirements under two discrete but interrelated theories.

■ The general rule is that venue must be established as to each separate cause of action.[55] However, as one commentator has explained, the focus is on the word *separate.*[56] Professor Moore notes that, whether the case involves a federal and nonfederal claim,[57] or two federal claims,[58] *if they amount to only one cause of action* with two grounds for relief, proper venue as to one federal ground will support adjudication of both grounds. His theory is that "there is no true problem of joinder of actions unless there be two or more causes of action; that a broad concept of cause of action eliminates or lessens the problem." [59] He goes on to apply to the venue context the broad definition of cause

---

**52.** 28 U.S.C. § 1402(b) (1982).

**53.** *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)) (emphasis added).

**54.** *Shear v. National Rifle Ass'n,* 606 F.2d 1251, 1253 (D.C.Cir.1979).

**55.** 15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3808 (1976).

**56.** 1 J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 0.142[3] (2d ed. 1984).

**57.** *Id.* ¶ 0.140[5].

**58.** *Id.*

**59.** *Id.*

of action from *Hurn v. Oursler*.[60] This notion of venue being required only for separate causes of action is still used,[61] even though *Hurn's* concept of cause of action has been replaced with respect to subject matter jurisdiction by the doctrine of pendent jurisdiction announced in *United Mine Workers v. Gibbs*.[62]

■ Applying that principle to the present case, it is clear that this litigation can accurately be described as a single cause of action with separate grounds for relief. Plaintiffs seek damages for "an essentially single wrong,"[63] i.e., wrongful death. They allege against the same defendant two separate grounds for relief. These two grounds are identical as to parties and very similar as to the proof. There will be great commonality as to witnesses and evidence. Recognizing that there is but a single cause of action, venue under § 1402(b) is satisfied for the entire case by virtue of the headquarters claims.

In the context of subject matter jurisdiction, the concept of "cause of action" has been replaced as the touchstone for analysis by the doctrine of pendent jurisdiction. This familiar concept has also spilled over into the rules of venue. The doctrine of "pendent venue" is now well established, particularly in cases where the court has previously exercised its discretion to hear a certain claim under pendent jurisdiction. As one commentator noted, "[i]t would seem that if procedural convenience is enough to avoid the constitutional limitations on the jurisdiction of the federal court, it should suffice also to dispense with the purely statutory requirements as to venue."[64] Consequently, many pendent jurisdiction cases also apply the principles of pendent jurisdiction by analogy when one or more claims arising out of a common nucleus of operative facts do not satisfy the requirements of the applicable venue statute.[65]

This has even been carried over into cases where subject matter jurisdiction was independently satisfied on each claim, although with a more limited application.[66] This extension was foreseen by the authors of another treatise, in which they explain the rule that venue must be proper for each claim.[67] They cite a Supreme Court case involving both patent and breach of contract claims.[68] Jurisdiction was proper on all claims due to the complete diversity of the parties, but venue was only proper as to the patent claim. The other claims had to be dismissed. The authors note that the case was decided long before the concept of pendent jurisdiction was developed,

60. 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933).

61. *See, e.g., LaMont v. Haig,* 590 F.2d 1124, 1135 (D.C.Cir.1978); *International Patent Dev. v. Wyomont Partners,* 489 F.Supp. 226, 230 (D.Nev. 1980); *Garfinkle v. Arcata Nat'l Corp.,* 360 F.Supp. 1296, 1298 (S.D.N.Y.1973).

62. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

63. *Hurn v. Oursler,* 289 U.S. at 246, 53 S.Ct. at 590.

64. C. WRIGHT, THE LAW OF FEDERAL COURTS § 10, at 32 (4th ed. 1983).

65. The rationale of similarity of proofs was important in the pre-*Gibbs* case of *Carolyn Chenilles, Inc. v. Ostow & Jacobs, Inc.,* 168 F.Supp. 894 (S.D.N.Y.1958). The court held that when the district court has jurisdiction over the patent infringement aspect of a case, and proofs as to both the patent infringement aspect and the unfair competition aspect would undoubtedly be substantially similar, and the needs of efficient administration dictated that, if possible, they should be tried together, the district court would retain jurisdiction over the unfair competition aspect, even if there were any doubt as to the proper venue of the unfair competition aspect.

66. Specifically, some courts have expressed reluctance about the application of pendent venue in patent infringement cases, with the special concerns those cases entail. *See, e.g., Hoffacker v. Bike House,* 540 F.Supp. 148, 149–50 (N.D.Cal. 1981); *Goggi Corp. v. Outboard Marine Corp.,* 422 F.Supp. 361, 366 (S.D.N.Y.1976).

67. 15 C. WRIGHT, A. MILLER & E. COOPER, *supra* note 55, § 3808, at 42.

68. *Geneva Furniture Mfg. Co. v. S. Karpen & Bros.,* 238 U.S. 254, 35 S.Ct. 788, 59 L.Ed. 1295 (1915).

and that the result should be different today.[69]

It would seem that there is no practical reason for limiting the application of pendent venue to cases where pendent jurisdiction has also been applied, and judges have recognized this by utilizing pendent venue when the case has merited it.

For example, in *Laffey v. Northwest Airlines*[70] the District Court for the District of Columbia found that it "need not decide whether [venue] is proper" for the cause of action under the Civil Rights Act of 1964[71] since venue was clearly proper under the Equal Pay Act claim.[72] The Equal Pay Act claim involved allegations that Northwest Airlines paid female in-flight cabin attendants less than male in-flight cabin attendants, and sought past-due and future wages. The Civil Rights Act claim involved allegations that Northwest discriminated in its employment practices against its female in-flight cabin attendants in that it used a discriminatory employment classification scheme and employment conditions including male priority in the "chain of command" and unequal treatment in regard to weight and height requirements, eyeglasses, uniform cleaning, and hotel accommodations.[73] Thus, *Laffey* can be aptly characterized as two separate causes of action arising out of a common nucleus of operative facts. This Court has subsequently cited *Laffey*, with respect to the general rule that venue must be satisfied as to each cause of action, for the notion that such a rule may be undesirable "when parties and proofs for all causes of action are identical."[74]

These same principles were applied in the case of *Zenith Radio Corp. v. Matsushita*

*Electric Industrial Co.*[75] That case involved, among other things, allegations under the Anti-Dumping Act of 1916[76] and federal antitrust law.[77] The court addressed defendant's argument that even if venue were proper under § 12 of the Clayton Act, it was not proper for the counts arising under the Anti-Dumping Act. As the court explained:

> It would be senseless for this court to bifurcate these two exceedingly complex antitrust cases by dismissing or transferring the anti-dumping counts while retaining the antitrust counts since the facts underlying both sets of issues are essentially the same. If ever a case has cried out for the exercise of pendent venue, these two antitrust actions do. Accordingly, in the interest of judicial economy this court will retain jurisdiction over the anti-dumping counts under the doctrine of pendent venue.[78]

In the case of *Seamon v. Upham*,[79] which originally was a Voting Rights Act case charging that the Texas apportionment plan in various ways diluted minority voting strength, plaintiff sought to file a supplemental complaint, adding under Federal Rule of Civil Procedure 18(a) a claim challenging the legality and constitutionality of the Texas Governor's proclamation which set a date for a special congressional election. This supplemental complaint clearly lacked venue. The court, in its examination of the doctrine of pendent venue, noted that a court exercising its discretion in a pendent venue case "should consider the same factors that it would consider in deciding whether to exercise pendent jurisdiction.... Thus it should consider wheth-

---

69. *See supra* note 54.

70. 321 F.Supp. 1041 (D.D.C.1971) (denial of motion to reconsider venue).

71. 42 U.S.C. §§ 2000e–2, 2000e–5(g) (1982).

72. 29 *id.* § 206(d)(1).

73. 321 F.Supp. at 1042.

74. *LaMont v. Haig,* 590 F.2d 1124, 1135 (D.C.Cir. 1978); *Relf v. Gasch,* 511 F.2d 804, 807 (D.C.Cir. 1975) (citing *Laffey* ).

75. 402 F.Supp. 262 (E.D.Pa.1975) (Higginbotham, J.).

76. 15 U.S.C. § 72 (1982).

77. Specifically the Clayton Act, *id.* § 22.

78. 402 F.Supp. at 328 n. 38.

79. 563 F.Supp. 396 (E.D.Tex.1983).

er the claims derive from a 'common nucleus of operative fact,' ... and whether the exercise of jurisdiction furthers the goals of judicial economy, convenience, and fairness to the litigants." [80] The court also noted that

> a federal court's exercise of pendent *venue* over an additional *federal* law claim—the issue presented in the case before us—does not raise either the question of the power or the propriety of federal court actions, the questions that were implicated in *Gibbs*. Nevertheless, we assume that the "common nucleus of operative fact" test should retain some weight in our discretionary deliberations, because it, in itself, embodies factors that bear upon judicial economy, convenience, and fairness. [81]

The court went on to decline to exercise pendent venue because it determined that the supplemental complaint arose out of a completely discrete set of circumstances. [82]

*Goggi v. Outboard Marine Corp.* [83] was a case where plaintiff sought to apply the concept of pendent venue to a patent claim. The court explained that, at least with re-

gard to the special patent venue statute, [84] this area of "pendent venue" has received limited application. [85] The court in *Goggi* distinguished those cases which did apply the concept of pendent venue by noting that "the sense of these opinions was that where there is substantial identity of issues and proof, it is most economical to try the various claims at one time." [86] Certainly the present case bears the same identity of parties and proofs found in *Laffey* and other pendent venue cases.

■ Whether to apply the principle of pendent venue in any given case is a discretionary decision, based on applicable policy considerations. Some of these considerations will be the same as those that support the exercise of pendent jurisdiction—judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants. Other considerations unique to the context of venue will apply. [87] For example, the purpose of venue rules is generally considered to be "primarily a matter of convenience of litigants and witnesses." [88] It is also oriented to the convenience of the court system. [89]

---

**80.** *Id.* at 399.

**81.** *Id.* at 399 n. 3.

**82.** *Id.* at 399. Many of these same considerations of judicial economy prompted this court to affirm a district court's denial of pendent venue over an FTCA claim in connection with a Privacy Act claim in the case of *Reuber v. United States,* 750 F.2d 1039 (D.C.Cir.1984). This court explained that many distinct issues of proof would be presented, and that "consideration of judicial economy must keep in mind that Reuber has identical claims to those considered here, including an FTCA action, already pending in federal district court in Maryland," at 1049, a consideration not present in this case. The court also noted that the FTCA "created a strong negative presumption against courts finding discretionary pendent venue elsewhere," *id.,* that is, in some district other than where plaintiffs reside or where the acts or omissions complained of occurred. In *Reuber,* plaintiff attempted to try his case in the District of Columbia, a forum where he did not reside and where the acts or omissions complained of did not occur. *Id.* at 1046. Plaintiff sought to use pendent venue completely to circumvent the FTCA's venue provisions by bringing his FTCA claims under the general value provisions applicable to the Privacy Act. In the present case, pendent

venue is used to satisfy venue requirements for a portion of plaintiffs' FTCA claims, based on the satisfaction of venue requirements by the remainder of plaintiffs' claims in this FTCA case.

**83.** 422 F.Supp. 361 (S.D.N.Y.1976).

**84.** The patent venue statute "reflects a Congressional awareness of the technical nature of patent litigation and the particular advantage in limiting its prosecution to forums where the acts of infringement occurred and the defendant is located." *Hoffacker v. Bike House,* 540 F.Supp. 148, 149 (N.D.Cal.1981).

**85.** 422 F.Supp. at 366.

**86.** *Id.*

**87.** *See* Comment, *Ancillary Process and Venue in the Federal Courts,* 73 Harv.L.Rev. 1164 (1960).

**88.** *Denver & R.G.W.R. Co. v. Brotherhood of R.R. Trainmen,* 387 U.S. 556, 560, 87 S.Ct. 1746, 1748, 18 L.Ed.2d 954 (1967).

**89.** *Whittier v. Emmet,* 281 F.2d 24 (D.C.Cir.), *cert. denied,* 364 U.S. 935, 81 S.Ct. 380, 5 L.Ed.2d

■ Given that all parties to this lawsuit will be properly before the district court on the headquarters claims, it does not seem too inconvenient to include the Antarctica claims in the same lawsuit. Indeed, even if the Antactica claims were sued on alone, the District of Columbia might well be the most convenient forum, since many of the witnesses will be either here in Washington, D.C. or scattered around the globe.[90] Records relating to the accident investigation of the Air New Zealand flight are located in Washington, D.C.[91] Much of the other evidence in the case will be either in the District of Columbia or at the Pentagon.[92]

Hearing the Antarctica claims also allows the district court to act in harmony with congressional intent and a rule of construction adopted by the Supreme Court, both of which are explained in *Brunette Machine Works v. Kockum Industries*.[93] The court noted that there had been and perhaps still were occasional cases in which the federal courts have jurisdiction but there is no district in which venue is proper, but that Congress had acted to close such gaps in 1966 by amending the general venue statute. The court noted that "the development supports the view that Congress does not in general intend to create venue gaps, which take away with one hand what Congress has given by way of jurisdictional ground with the other. Thus, in construing venue statutes it is reasonable to prefer the construction that avoids having such a gap."[94] In the present case, dismissal of the Antarctica claims for lack of venue creates a gap between jurisdiction and venue and works a hardship not usually found in dismissals for lack of venue, which are often done with an eye toward another court in which subject matter jurisdiction and venue can

both be established. No one contends here that venue lies elsewhere. The government, consistent with its position that there is no law in Antarctica, maintains that venue exists—nowhere.

Whether viewed as a single cause of action with two grounds for relief (two claims), or as an appropriate case to apply the principle of "pendent venue" to the headquarters and Antarctica claims, this case satisfies the venue requirements of § 1402(b).

## III. CHOICE OF LAW

Choice of law issues in FTCA actions are governed by 28 U.S.C. § 1346(b), which states that the district courts "shall have exclusive jurisdiction of civil actions on claims against the United States ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[95] This section has been construed to mean that the district court should apply as a choice of law rule the whole law of the place where the act or omission occurred.[96]

■ In this wrongful death case, some undetermined portion of the acts or omissions complained of occurred in the District of Columbia. Thus, at least as to the headquarters claims, and probably as to the entire case, application of D.C. law would mean that this "civil action" would be tried "in accordance with the law of the place where the act or omission occurred."

The Antarctica claims presents another novel issue. By directing application of the law of the place where the act or omission occurred, § 1346 leads the court to a place

367 (1961); *Jones v. United States*, 407 F.Supp. 873 (N.D.Tex.1976).

90. Brief for Appellees at 40.

91. *Id.*

92. *Id.* at 40–41.

93. 406 U.S. 706, 92 S.Ct. 1936, 32 L.Ed.2d 428 (1972).

94. *Id.* at 710 n. 8, 92 S.Ct. at 1939 n. 8.

95. 28 U.S.C. § 1346(b) (1982).

96. *See Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

where this is no civil tort law to apply.[97] As we have seen, this is a situation *directly opposite* to the fear of becoming entangled in foreign law, which produced the "foreign country" exception. Hence, for this and other reasons, contrary to the government's assertions, we do not feel that the logical conclusion to be derived therefrom is that the entire case ought to be dismissed.[98] Rather, we feel that this represents a question not answered by the statute, and turn to those factors relevant to the choice of the applicable rule of law when there is no such statutory directive. Those factors, outlined in Restatement 2d, Conflict of Laws § 6, point to the District of Columbia as the forum whose law should be applied in this case.[99]

This is not a case such as *Sami*,[100] where a foreign state's substantive law is supplanted by the law of the forum because it conflicts with a strong public policy of the forum.[101] Rather, by traditional analysis, among the two "forums" with the greatest interest in the outcome of this litigation— Antarctica and the United States—only one has any civil law to apply. And, in fact, Antarctica has no "forum" either; fundamentally, because Antarctica is not a "country," foreign or otherwise.

These considerations are similar to those which influenced the court's decision in *Agent Orange*.[102] In that case the erratic ebb and flow of sovereignty in Southeast Asia led the court to conclude that "there is no theoretical justification for application of foreign law."[103]

 These conclusions are buttressed by the recognized principle of international law that a nation may exercise jurisdiction over its nationals as a legitimate exercise of the nationality principle. The United States recognizes the validity of the nationality principle.[104]

 The United States has a strong public policy interest in the outcome of this litigation. In addition, the District Court for the District of Columbia has a strong interest in bringing to a resolution a case which has been properly filed in that court in which it has both subject matter jurisdiction and venue. In contrast to these and other strong interests of the District of Columbia forum, there is no foreign sovereign even to assert a countervailing interest in Antarctica. The proper law to be applied to the case would be District of Columbia law.

In summary, the government argument requires us to accept an analysis of the FTCA, section 2680(k), that there are two areas of the world only—first, the United States, and second, "foreign countries." There are obviously several other areas in which people operate, e.g., outer space, the high seas, and Antarctica. While the other non-United States/non-foreign country areas may be covered by some law, we have a no-man's land of law in Antarctica, unless United States law covers the actions of United States citizens—not an unfair concept—and United States law includes the Federal Tort Claims Act.

All of this attempted limitation of coverage rests on one indefensible concept—that Antarctica is a "foreign country." Such an interpretation does violence to the plain meaning of the statute and the purpose behind the "foreign country" exception. While there are theoretical procedural obstacles, these can be logically overcome once the basic concept that United States law applies at least to the actions of United States citizens in Antarctica is accepted,

97. Brief for Appellants at 17.

98. *Id.*

99. *See, e.g.,* E. Scoles & P. Hay, Conflict of Laws 551–606 (1984); Restatement (Second) Conflict of Laws § 6 (1971).

100. *Sami v. United States,* 617 F.2d 755 (D.C.Cir. 1979).

101. *Id.* at 763.

102. *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 1242 (E.D.N.Y.1984).

103. *Id.* at 1254.

104. Restatement of Foreign Relations Law of the United States § 402 (Ten.Draft No. 2, 1981).

and the other side of the coin is visualized, i.e., that unless this concept *is* accepted, Antarctica is an area without any law whatsoever.

The decision of the District Court is *Affirmed* and the case is *Remanded* for further proceedings consistent with this opinion.

*So Ordered.*

SCALIA, Circuit Judge, dissenting:

It is conceivable (though barely) that a court might have to conclude that a particularly ill-drafted statute created federal causes of action over which no federal court had venue, and directed the courts to apply the law of a place that has no law. What makes the majority opinion in this case unique is that it does not reach these strange conclusions by sheer compulsion, but adopts them as the *preferred* interpretation of a statute that could readily be construed otherwise. One is at a loss to explain the result except as a manifestation of the territorial imperative that impels this court to extend its writ to foreign lands when the United States or its officers are sued. *Cf. Ramirez v. Weinberger*, 745 F.2d 1500 (D.C.Cir.1984) (en banc). I dissent because in my view it is clear beyond doubt that the Federal Tort Claims Act does not apply to a claim arising in Antarctica; and because I think that this case presents only a single claim, which arose there.

## I. BACKGROUND

Although, as subsequent discussion will show, I do not share the majority's assessment of the importance of the legal and operational details of the United States' presence in Antarctica (other than the undisputed fact that the United States asserts no legislative jurisdiction there), it is nonetheless of some value to be clear on what we are talking about. It is not accurate to characterize Antarctica as a "large continent which has never been and is not now subject to the sovereignty of any nation." Maj. op. at 93. It is more properly described, in the words of one leading book on the area, as "an entire continent of *disputed* territory." F. AUBURN, ANTARCTIC LAW AND POLITICS 1 (1982) (emphasis added) [hereinafter cited as F. AUBURN, ANTARCTICA]. Seven countries—Argentina, Australia, Chile, France, New Zealand, Norway and the United Kingdom—have made formal claims (some of which are conflicting) to portions of the continent that total about 85 percent of its expanse. Boczek, *The Soviet Union and the Antarctic Regime*, 78 AM. J. INT'L L. 834, 840 (1984). Other nations, including the United States and the Soviet Union, have substantial bases for claims which they have not yet chosen to assert. *See id.* at 841; F. AUBURN, ANTARCTICA, at 48–83.

It is also wrong to conclude that "[u]nder the Antarctica Treaty of 1959 the signatory nations agreed not to exercise sovereignty in Antarctica," Maj. op. at 93. Article IV(1) of that treaty merely provides that the treaty does not *prejudice* any nation's claim or basis for a claim to Antarctica; and Article IV(2) merely provides that while the treaty is in force no activities shall constitute a basis for asserting a claim in Antarctica and no new claim shall be asserted.[1] Claims asserted prior to the

---

**1.** Article IV of the Antarctic Treaty, Dec. 1, 1959, 12 U.S.T. 794, 796, T.I.A.S. No. 4780, 402 U.N.T.S. 71, provides as follows:

 1. Nothing contained in the present Treaty shall be interpreted as:

 (a) a renunciation by any Contracting Party of previously asserted rights of or claims to territorial sovereignty in Antarctica;

 (b) a renunciation or diminution by any Contracting Party of any basis of claim to territorial sovereignty in Antarctica which it may have whether as a result of its activities or those of its nationals in Antarctica, or otherwise;

 (c) prejudicing the position of any Contracting Party as regards its recognition or non-recognition of any other State's right of or claim or basis of claim to territorial sovereignty in Antarctica.

 2. No acts or activities taking place while the present Treaty is in force shall constitute a basis for asserting, supporting or denying a claim to territorial sovereignty in Antarctica. No new claim, or enlargement of an existing claim, to territorial sovereignty in Antarctica

effective date of the treaty, or not yet asserted but based upon pre-treaty activities, are unaffected, *as is the right of all nations to implement past-asserted claims by the exercise of sovereignty. See The Antarctic Treaty: Hearings Before the Senate Comm. on Foreign Relations,* 86th Cong., 2d Sess. 39, 61–62 (1960) (testimony of Herman Phleger of the Department of State, Head of the United States Delegation to the Antarctic Conference) [hereinafter cited as *Treaty Hearings*]. Thus, Article VIII of the treaty, which provides for exclusive jurisdiction of each contracting party over its nationals who are designated observers and scientific personnel, specifically states that this provision is "without prejudice to the respective positions of the Contracting Parties relating to jurisdiction over all other persons in Antarctica," and further provides that "the Contracting Parties concerned in any case of dispute with regard to the exercise of jurisdiction in Antarctica shall immediately consult together with a view to reaching a mutually acceptable solution." 12 U.S.T. at 797–98. All seven countries claiming territory in Antarctica have "either specifically enacted legislation governing criminal conduct in Antarctica or appear to consider their domestic criminal legislation applicable to areas they claim." Bilder, *Control of Criminal Conduct in Antarctica,* 52 VA.L.REV. 231, 260 (1966).

McMurdo Station is located on Ross Island, as is Mount Erebus, into which Flight 901 crashed. The island forms part of an area known as "the Ross Dependency," encompassing land from 160° East longitude to 150° West longitude, over which New Zealand has a longstanding claim based upon a 1923 Order in Council by the United Kingdom to the Governor of New Zealand. Joyner, *Antarctica and the Law*

*of the Sea: Rethinking the Current Legal Dilemmas,* 18 SAN DIEGO L.REV. 415, 417 n. 8 (1981); F. AUBURN, THE ROSS DEPENDENCY 5 (1972) [hereinafter cited as F. AUBURN, ROSS DEPENDENCY]. *See generally* Richardson, *New Zealand's Claims in the Antarctic,* 33 NEW ZEALAND L.J. 38 (1957). New Zealand's claim is recognized by Australia and the United Kingdom, F. AUBURN, ANTARCTICA, at 29,[2] and according to one commentator by Argentina, Chile, France and Norway as well, P. QUIGG, A. POLE APART: THE EMERGING ISSUE OF ANTARCTICA 113 (1983). Also, if "sector" claims [3] are recognized in Antarctica, New Zealand might be able to assert such a claim over the area at issue here as the country which, longitudinally, is immediately above it. New Zealand has explicitly extended its domestic criminal law to the Ross Dependency, New Zealand Antarctic Act of 1960, *reprinted in* 11 POLAR RECORD 303 (1962), and by exchange of notes has granted the United States air and naval facilities located there exemption from taxation, customs duties, radio station licensing, and criminal jurisdiction in minor cases, *see* Agreement on Operations in Antarctica, Dec. 24, 1958, United States-New Zealand, 9 U.S.T. 1502, T.I.A.S. No. 4151, *renewed indefinitely,* Oct. 18, 1960, 11 U.S.T. 2205, T.I.A.S. No. 4591.

The United States refuses to recognize territorial sovereignty in Antarctica; at the same time, however, it maintains a basis for asserting claims of its own. *Law of the Sea Negotiations: Hearings Before the Subcomm. on Arms Control, Oceans, International Operations and Environment of the Senate Comm. on Foreign Relations,* 97th Cong., 1st Sess. 24–25 (1981) (statement of Assistant Secretary of State James L. Malone). It is not clear

---

shall be asserted while the present Treaty is in force.

**2.** There is some ambiguity as to whether New Zealand is merely "administering" British claims or whether it has its own independent claim. F. AUBURN, ROSS DEPENDENCY, at 70–73.

**3.** Sector claims are wedge-shaped claims derived by tracing lines from southernmost base

points outside Antarctica over which a country has control down to the South Pole. The theory was first developed in the Arctic, but several countries have suggested that it should be used in Antarctica as well. It has been harshly criticized. *See generally* F. AUBURN, ANTARCTICA, at 17–31.

how much basis for a claim it has to the area in which McMurdo Station is located. *See generally* F. AUBURN, ANTARCTICA, at 66–74.[4] Of course the determination by the Executive Branch not to recognize claims of territorial sovereignty in Antarctica is binding on this Court, *see United States v. Pink,* 315 U.S. 203, 229–30, 62 S.Ct. 552, 565–66, 86 L.Ed. 796 (1942), but we need not blind ourselves to the internationally disputed character of the land in question.

With regard to operational as opposed to legal considerations, the majority opinion again exaggerates the position of the United States in Antarctica. It quotes the District Court's statement that " '[t]he United States conducts all search and rescue operations in Antarctica and, significantly, it controls all air transportation.' " Maj. op. at 99 (*quoting Beattie v. United States,* 592 F.Supp. 780, 783 (D.D.C.1984) (footnotes omitted)). One must be dubious about an assertion that the United States could so dominate an area containing roughly one-tenth of the world's land mass, at the bottom of the opposite hemisphere, in which numerous other countries conduct extensive operations. The majority offers as authority for this remarkable assertion only the District Court, which in turn offered only the following footnote:

> For example, when in 1969 a group of New Zealand Alpine Club members desired to explore a range in Victoria Land, an area in Antarctica near the Ross Sea, it was refused permission because American authorities had limited allocation of space on its aircraft for New Zealanders. F.M. Auden [*sic,* should be AUBURN], *The Ross Dependency* 74–75 (1972).

592 F.Supp. at 783 n. 21. Professor Auburn was clearly not advancing the proposition that the United States "controls all air transportation" in Antarctica. Indeed, he was not even implying such control in the small portion of Antarctica known as the Ross Dependency. Rather, he was exem-

plifying the point that New Zealand relies upon the United States for logistical support of its operations in the Ross Dependency. That does not even suggest that the United States is the only nation with flight capacity in that limited region. In fact, both New Zealand and Australia have flown regular support operations for the United States to McMurdo Base. *See* F. AUBURN, ANTARCTICA, at 68; *U.S. Antarctic Program: Hearings Before the Subcomm. on Science, Research, and Technology of the House Comm. on Science and Technology,* 96th Cong., 1st Sess. 80 (1979). Moreover, it is clear that the United States does not "control all air transportation" in the sense of granting and denying permission for, and directing the path of, flights by other states. "Tourist flights over Antarctica depend on McMurdo Station for weather reports, but whether or not planes fly, on what route, and at what altitude are entirely at the discretion of their captains." P. QUIGG, *supra,* at 101; *see also* Brief for Appellees at 3 (emphasis added) (asserting only that McMurdo Station was *"advised* of schedules and the flight plans of the anticipated sightseeing tours").

The majority again relies upon the District Court for an even more inspiring, but also even more inaccurate, statement: " 'to the extent that there is any assertion of governmental authority in Antarctica, it appears to be predominantly that of the United States.' " Maj. op. at 99 (*quoting* 592 F.Supp. at 783). In support of this conclusion, the District Court offered the statement on rescue operations and air transportation quoted above, and the following:

> [W]hen Admiral Byrd first occupied Antarctica, he established a United States Post Office in the Ross Dependency. That Post Office has since been abandoned but McMurdo base now operates under a United States zip code. United States dollars are the currency of exchange at that base, and all persons on

---

**4.** One of the strongest bases rests upon the fact that "[b]y direction of the President of the United States, Lieutenant J.H. Roscoe claimed 'Ross Island and the areas about McMurdo Sound' on 29 January 1948, declaring that he had surveyed

and investigated the territory." F. AUBURN, ANTARCTICA, at 66. However, when Admiral Byrd claimed other territory for the United States, he appeared to recognize New Zealand's claims in the area. F. AUBURN, ROSS DEPENDENCY, at 58.

flights that land there must fill in immigration cards.

592 F.Supp. at 783 (footnotes omitted). Such formidable exercises of American power at McMurdo Station hardly carry the point. There are more than thirty stations in Antarctica, of which only four are American. *See* F. AUBURN, ANTARCTICA, at xvi-xvii, xx (maps). Moreover, numerous countries conduct Antarctic operations, and while the United States may have the largest program, those of other countries are significant. The Soviet Union alone has "developed an Antarctic program rivaling that of the United States." Note, *Thaw in International Law? Rights in Antarctica under the Law of Common Spaces*, 87 YALE L.J. 804, 814 (1978) (footnote omitted).

The majority notes—presumably to suggest that agencies of our government do not consider Antarctica "foreign"—that "[t]he International Flight Information Manual, published by the Federal Aviation Administration [FAA], does not list Antarctica in its designations of 'foreign countries' in international aviation." Maj. op. at 99 (footnote omitted). The omission is utterly without significance, however, since the manual lists only airfields which are open to the public and which "business and private aviators" can fly to directly. *See generally* FAA, International Flight Information Manual, vol. 31 at 1 (Apr. 1983). Virtually all American military airfields overseas (*e.g.*, McMurdo Naval Air Station, Antarctica) are not listed since special permission is required to use them. *See id.* at 8. The airfields of other nations in Antarctica apparently operate under similar restrictions. *See* F. AUBURN, ANTARCTICA, at 279; P. QUIGG, *supra*, at 103.

Again presumably as evidence that that distant land is not really "foreign," the majority thinks the assignment of a postal zip code to McMurdo Station (96692) important enough to bear mention twice in its opinion. *See* Maj. op. at 93, 99. The zip code listing for "McMurdo Station, Antarctica" is part of a list of military post offices outside the continental United States that includes, inter alia, Berlin, Germany (09742); Rio de Janeiro, Brazil (34030); and Zama, Japan (96343). McMurdo will be found immediately after the listing for Christchurch, New Zealand and just before the listing for Singapore. U.S. Postal Service, NATIONAL FIVE DIGIT ZIP CODE AND POST OFFICE DIRECTORY cxxv (1983). The instructions at the top of this list read: "A higher rate of postage will be charged if the foreign country is used in conjunction with the MPO's [military post office's] address." *Id.* at cxxiv. Thus, a letter sent to McMurdo Station, *Antarctica* 96692 (as opposed to simply McMurdo Station 96692), pays the higher "foreign country" mailing rate. In any case, I personally feel that as a display of sovereign epistolary power, the assignment of a zip code is topped by New Zealand's seizure of the philatelic monopoly; it has issued Ross Dependency postage stamps, in more than one denomination, *see* F. AUBURN, ROSS DEPENDENCY, at 61.

With this clarification of background, I proceed to discussion of the substantive issues in this case.

## II. ANTARCTICA IS A FOREIGN COUNTRY

### The Statutory Text

The statutory language upon which this case turns is 28 U.S.C. § 2680(k) (1982), which provides that the Federal Tort Claims Act's (FTCA's) waiver of sovereign immunity does not apply to "[a]ny claim arising in a foreign country." The essence of appellees' position, accepted by the majority, is that the word "country" in this text means "sovereign state"—so that if a land such as Antarctica, subject (in the view of this government) to no national jurisdiction, is involved, the exception does not apply.

The first dictionary meaning of "country" is not "sovereign state" but simply "region," Webster's Ninth New Collegiate Dictionary 298 (1983), *see also id.* at 483 (first definition of "foreign" is "situated outside a place or country; *esp.* situated outside one's own country")—and it so hap-

pens that the term was used precisely in that customary sense in the congressional discussions of the Antarctica Treaty. *See, e.g., Treaty Hearings,* at 61 (statement of Sen. Aiken) ("If this agreement is approved, Antarctica becomes a country without a government"). It must be acknowledged, however, that the term can be used in the sense appellees would derive—when one speaks, for example, of the "democratic countries of the world."[5] It is appropriate, then, to look for clarification elsewhere in the statute—which readily discloses that the former meaning must be intended, since otherwise two crucial portions of the legislative scheme make no sense and a third conflicts with the Antarctica Treaty.

*The Venue Provision*

Section 1402(b) of 28 U.S.C. (1982) provides:

> Any civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred.

Our recent decision in *Reuber v. United States,* 750 F.2d 1039 (D.C.Cir.1984), notes the importance of this provision:

> [W]hen the United States waives sovereign immunity, it may choose the conditions under which a suit against it is to proceed. *Lehman v. Nakshian,* 453 U.S. 156, 161 [101 S.Ct. 2698, 2701, 69 L.Ed.2d 548] (1981) ("limitations and conditions upon which the government consents to be sued must be strictly observed and exceptions thereto are not to be implied"). Here Congress has specified the district in which the act occurred as the "only" district, other than that where the plaintiff resides, where a claim may be brought.... "The United States, as sovereign, is immune from suit save as it consents to be sued, ... and the terms of its consent to be sued in any court define

that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586 [61 S.Ct. 767, 769, 85 L.Ed. 1058] (1941) (citations omitted). Thus, it is unclear whether a district court even has jurisdiction to hear a[ ] FTCA claim anywhere but in the district specified by 28 U.S.C. § 1402(b).

*Id.* at 1048 & n. 11.

If, as the appellees assert, "foreign country" means only "foreign state," and sovereign immunity has therefore been waived with respect to torts occurring in stateless regions such as Antarctica, then the venue provision for those regions makes no sense, since the "only ... judicial district" in which suit has been allowed will *usually not exist—i.e.,* will exist only if the plaintiff happens to reside in the United States.

The majority quotes *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.,* 406 U.S. 706, 710 n. 8, 92 S.Ct. 1936, 1939 n. 8, 32 L.Ed.2d 428 (1972), to the effect that " 'Congress does not in general intend to create venue gaps which take away with one hand what Congress has given by way of jurisdictional grant with the other.' " Maj. op. at 104. Quite so. In *Brunette* the jurisdiction of the federal courts was clear, and the consequence of applying the enunciated principle was to give broad interpretation to an ambiguous venue provision—to avoid taking away what one hand clearly had given. Here, by contrast, the limited character of the *venue* provision is entirely clear, and the consequence of the principle is to give narrow interpretation to the ambiguous jurisdictional provision—to avoid giving what one hand has clearly taken away.

Nor can this gap in the venue provision plausibly be explained as a product of legislative oversight—a detail beyond the normal capacity or inclination of Congress to address. For in other legislation, including

---

**5.** Since I readily make this acknowledgment, I deem irrelevant the "analogous statutes" discussed by the majority, Maj. op. at 98–99 (a category thought to include such enactments as the Interstate Transportation of Wagering Paraphernalia Act), which define the term "foreign

country" in such fashion as apparently to exclude Antarctica. Obviously, the meaning of "[t]he term 'foreign country' ... is to be ascertained with reference to the particular act in which it is used." *Straneri v. United States,* 77 F.Supp. 240, 241 (E.D.Pa.1948).

specifically legislation dealing with Antarctica, Congress has anticipated and prevented venue gaps by including catch-all provisions. In the Antarctic Conservation Act of 1978, 16 U.S.C. § 2404(e) (1982), it provided for review of decisions involving permits to take Antarctic plants or animals "in the United States district court wherein the applicant for a permit resides, or has his principal place of business, or in the United States District Court for the District of Columbia." In the Public Vessels Act, 46 U.S.C. § 782 (1982), it provided that "in case none of such parties reside or have an office for the transaction of business in the United States, and such vessel or cargo be outside the territorial waters of the United States, then [venue is proper] in any district court of the United States." In the Tucker Act, 28 U.S.C. § 2502 (1982), it provided that "[c]itizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the Claims Court if the subject matter of the suit is otherwise within such court's jurisdiction."

In short, the venue provision of the FTCA, which assumes the availability of a court only for those torts that occur *within a federal judicial district*, makes it clear beyond doubt that "foreign country" in the exclusion provision has its ordinary meaning of any region outside the United States.

## The Choice-of-Law Provision

The choice-of-law provision of the FTCA reads in relevant part as follows:

[T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States ... under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b) (1982) (emphasis added). The Supreme Court has made clear that this language means precisely what it says:

In the Tort Claims Act Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred, and we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used. We believe that it would be difficult to conceive of any more precise language Congress could have used to command application of the law of the place where the negligence occurred than the words it did employ in the Tort Claims Act.

*Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962) (footnote omitted); *see also Sami v. United States*, 617 F.2d 755, 761 (D.C.Cir.1979) ("The entire scheme of the FTCA focuses on the place where the negligent or wrongful act or omission of the government employee occurred"). The majority finds that "§ 1346(b) leads the court to a place where there is no civil tort law to apply." Maj. op. at 104–105 (footnote omitted). I think, to the contrary, that it leads the court to the same place the venue provision does—to the conclusion that the FTCA no more envisions suits for torts occurring in stateless foreign regions than it does suits for torts occurring in foreign sovereignties. If "foreign country" is given its usual meaning, there will always be "civil tort law to apply" just as there will always be a district court with venue.

## The Antarctica Treaty

The interpretation of "foreign country" the majority has adopted not only sets various sections of the FTCA itself at war with one another, but also creates a clear conflict between that legislation and the Antarctica Treaty. In the treaty, the United States agreed not to assert for the time being United States territorial jurisdiction over Antarctica. (The exercise of such jurisdiction presupposes a claim; the United States has asserted no claim; and the treaty provides that during its effectiveness no new claims shall be asserted. *See* discussion at pages 106–107, *supra*; Bilder,

*supra,* 52 VA.L.REV. at 270.) I agree with the majority that the United States may permit itself to be sued for its acts anywhere in the world, pursuant to the law of the place where those acts occurred, through the exercise of a basis of jurisdiction other than territorial sovereignty, analogous to "the recognized principle of international law that a nation may exercise jurisdiction over its nationals," Maj. op. at 105. The FTCA, however, does more than merely *permit* suit against the United States. Section 2679 of 28 U.S.C. (1982), entitled "Exclusiveness of remedy," and enacted *subsequent* to the treaty, provides as follows:

> (b) The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property or personal injury or death, resulting from the operation by any employee of the Government of any motor vehicle while acting within the scope of his office or employment, shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or his estate whose act or omission gave rise to the claim.

If the Act is interpreted as the majority suggests, this provision would bar a New Zealander from suing an employee of the United States (even if that employee happened to be a New Zealand national) for a tort committed by that employee in Antarctica; plaintiff's substantive rights would be limited to his suit against the United States in United States courts. There is no conceivable basis for this assertion of legislative jurisdiction except the principle of territorial sovereignty, which assertion conflicts with our treaty obligations. It does not matter, of course, that this exclusivity provision is limited to a type of tort not immediately at issue in this case (injury or damage caused by motor vehicles). The point is that the rationale of the majority's decision—holding Antarctica not to be a "foreign country" for purposes of the FTCA—renders this provision in violation of the treaty.

Since the treaty predates this provision, which was added to the FTCA in 1961, Pub.L. No. 87–258, § 1, 75 Stat. 539 (Sept. 21, 1961), the result of the conflict would be that our assertion of territorial jurisdiction in Antarctica would stand, despite its violation of treaty commitments. It is contrary to sound principles of statutory construction, however, to interpret an ambiguous provision (in this case the "foreign country" exception) in a fashion that produces such consequences.

> By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either. . . .

*Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888). It should not be thought, incidentally, that the treaty provisions assure that our exercise of territorial jurisdiction will not be a matter of concern to other nations. *See generally* Comment, *Quick, Before It Melts: Toward a Resolution of the Jurisdictional Morass in Antarctica,* 10 CORNELL INT'L L.J. 173, 185–86 n. 57 (1976) (noting that jurisdictional assertions even during the pendency of the Treaty could be used to strengthen territorial claims). Of course it would be possible to *say* that this conflicting exclusive-remedy provision of the FTCA was simply not meant to have the same scope as the other provisions of the Act, and does not apply outside the territorial United States—just as the majority has found it possible to create venue and choice-of-law solutions out of whole cloth. But when these imaginative exercises can be avoided by giving the phrase "foreign country" its ordinary meaning, to perform them is to rewrite the statute rather than interpret it.

### Accepted Principles of Construction

One would therefore logically conclude, even without the benefit of any special

principles of statutory construction, that "foreign country" in the present text means any location outside the territorial jurisdiction of the United States. In fact, however, several such principles of construction are applicable, all of which reinforce the same conclusion and render it in my view inevitable.

First, there is "the 'canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States....'" *United States v. Spelar,* 338 U.S. 217, 222, 70 S.Ct. 10, 13, 94 L.Ed. 3 (1949) (*quoting Foley Brothers, Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). *See also Natural Resources Defense Council, Inc. v. NRC,* 647 F.2d 1345, 1357 n. 54 (D.C.Cir.1981); RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 38 (1965). In other words, even without the "foreign country" exclusion it would be improper to interpret the FTCA as applying to acts or events in Antarctica. It is perverse to give the explicit exclusion of foreign claims the consequence of expanding the Act. Rather, as the Supreme Court observed in *Spelar,* the presumption against extra-territorial application "is doubly fortified by the language of [the FTCA] and the legislative purpose underlying it." 338 U.S. at 222, 70 S.Ct. at 13.

Second, the Supreme Court has set forth a guide to the interpretation of the FTCA in particular. "[T]he effect of the Act," it has said, "was 'to waive immunity from recognized causes of action and ... not to visit the Government with novel and unprecedented liabilities.'" *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 671, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977) (*quoting Feres v. United States,* 340 U.S. 135, 142, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950)).[6] To my knowledge, not only has no state ever permitted itself to be sued for alleged torts committed in a stateless land such as Antarctica, but no modern state has ever entertained in its courts a tort suit between *private* parties who were not both its citizens relating to activities in such a land.[7]

Finally, even if applying the FTCA to Antarctica in the present case represents no more than an exercise of non-territorial jurisdiction, it violates a broad principle of statutory construction—of which the canon of presumed territorial application discussed earlier is merely one manifestation—which avoids giving an ambiguous provision content that is likely to cause what the Supreme Court has described in another context as "embarrassment to the Executive Branch in handling foreign relations," *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 412, 84 S.Ct. 923, 932, 11 L.Ed.2d 804 (1964). Appellees' statement that "[t]he [Antarctic] Treaty itself acknowledges each treaty country's jurisdiction over its own nationals," Brief for Appellees at 27, is incorrect. The treaty does not speak to jurisdiction over anyone except certain designated scientists and observers. *See* Bilder, *supra,* 52 VA.L.REV. at 237–38. The failure to provide nationality jurisdiction resulted not from oversight but from the fears of several nations that it would undermine their claims. *Id.* at 238 n. 21; F. AUBURN, ANTARCTICA, at 184. The

---

6. The Court seemed to retreat from this principle of *Feres* in *Rayonier, Inc. v. United States,* 352 U.S. 315, 319–20, 77 S.Ct. 374, 376–77, 1 L.Ed.2d 354 (1957), and *United States v. Muniz,* 374 U.S. 150, 159–60, 83 S.Ct. 1850, 1856–57, 10 L.Ed.2d 805 (1963), but the principle was reinstated in *Stencel,* as the quotation in text indicates. *See Hunt v. United States,* 636 F.2d 580, 584–89 (D.C.Cir.1980); *Maw v. United States,* 733 F.2d 174, 176 (1st Cir.1984); *Johnson v. United States,* 631 F.2d 34, 36 (5th Cir.1980), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981).

7. In *Chaplin v. Boys,* [1971] A.C. 356, 396, 401, Lord Pearson suggested that if one Englishman wrongfully injures another in a primitive or unsettled territory where there is no law of torts, English law could be applied. Justice Holmes suggested a similar retention of the ancient law of "personal sovereignty" in *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 355–56, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909). Both of these formulations assume that both parties are citizens of the adjudicating sovereign. Here, of course, the appellees are foreigners.

United States is undoubtedly free to apply that principle (or an analogous principle) in Antarctica, but I would leave that decision to the political branches rather than make it judicially, by interpreting an ambiguous statute to produce that result. Such a course is simply insensitive to the delicate diplomatic *modus vivendi* that our Executive has worked out among nations with claims or potential claims to this important part of the world.

### Legislative History

The evidence of the statute itself is so overwhelmingly clear as to require no resort to the questionable assistance of legislative history. But even there the conclusion is only strengthened rather than called into doubt. The weakness of the majority's case on this score is demonstrated by what it chooses to discuss first: an amendment proposed in 1940 that would have specifically limited the scope of the FTCA to "damage or injury occurring within the geographical limits of the United States, Alaska, Hawaii, Puerto Rico [and] the Canal Zone." *Tort Claims Against the United States: Hearings on S. 2690 Before a Subcomm. of the Sen. Comm. on the Judiciary*, 76th Cong., 3d Sess. 65 (1940) [hereinafter cited as *1940 Senate Hearings*]. The majority notes that "no such language was accepted, and the previous 'foreign country' version was retained." Maj. op. at 95. What it neglects to note is that there is no reason to believe the "proposed amendment" was ever *considered*. It was in fact not even "proposed" in the ordinary sense of having been offered by a Member of Congress as a bill or an amendment to a bill. Rather it was nothing more than part of an alternative version of the bill offered to a Senate *subcommittee* for inclusion in the record by one J.J. Keegan, a member of the United States Employees' Compensation Commission. It was never even put to a vote of the subcommittee—and indeed subsequent hearings are devoid of any discussion of Keegan's proposals in general and of this proposed change in particular. Understandably so, since Keegan began his testimony in support of six pages of proposed stylistic and substantive changes with the following statement:

> I could not sit here without listening to and relishing the discussion between such very able lawyers as [Sen. Danaher] and Mr. Holtzoff. I must say that I am not an attorney, and you will not have any legal discussion from me.... I am not accustomed to use [*sic*] legal phraseology, but I believe when a fellow gets into court he sometimes uses an alibi by saying he is a friend of the court. Possibly I might take that position here.

*1940 Senate Hearings* at 53. One does not have to be overly impressed with the virtues of a law degree to conclude that the subcommittee decided to leave what was quintessentially a legal matter (how to waive the long-standing sovereign immunity of the government) to "very able lawyers" and simply ignored the suggestions of Mr. Keegan. In addition, even if a subcommittee of Congress did consider this snippet of Mr. Keegan's presentation, its rejection would prove nothing. Congress may have thought it preferable to express the Act's limitation to United States territory by simply excluding torts in "foreign countries," instead of reciting a list of "nonforeign countries." *See Western Coal Traffic League v. United States*, 677 F.2d 915, 924 (D.C.Cir.), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982) ("amendments to a bill's language are frequently latent with ambiguity: they may either evidence a substantive change in legislative design or simply a better means for expressing a provision in the original bill"). In fact, we do not even know whether Mr. Keegan *himself* thought there was any difference in substance between the two formulations. And finally, to cap it all, Mr. Keegan's proposal not only explicitly spelled out the geographical limits but also made the criterion whether the "damage or injury occurr[ed]" within those limits, *1940 Senate Hearings* at 65,—which is of course not the same as whether the "claim ar[ose]" there, *see Richards v. United States*, 369 U.S. 1, 9–10, 82 S.Ct. 585, 590–591, 7 L.Ed.2d 492 (1962). *If* Congress was aware of this proposal, and *if* it made a

conscious rejection, it seems to me a better guess that this significant feature was the reason.

One must admire the thoroughness of appellees' research that could have unearthed Mr. Keegan and this portion of his extensive suggestions. But that this is the closest thing to a friend they have been able to find at the ever-congenial banquet of legislative history (in the case of the FTCA, a banquet with separate sittings in a number of years before it was finally adopted in 1946) is perhaps the strongest indication of how bereft of support their position must be. I may add that the willingness of the majority to rely upon such an irrelevancy is perhaps the strongest indication of the wisdom of the English courts in refusing to attend these feasts.

If it were necessary to consult legislative history in order to determine whether that interpretation of the statute should be adopted which leads to completeness and consistency or that which leads to inadequacy and confusion; then the relevant portion is the testimony by Assistant Attorney General Francis M. Shea, explaining to the House Committee on the Judiciary the revised version of the bill proposed by the Attorney General and (in the aspect at issue here) actually adopted by the Congress:

> Claims arising in a foreign country have been exempted ... whether or not the claimant is an alien. Since liability is to be determined by the law of the situs of the wrongful act or omission it is wise to restrict the bill *to claims arising in this country*. This seems desirable because the law of the particular state is being applied. Otherwise, it will lead I think to a good deal of difficulty.

*Tort Claims: Hearings on H.R. 5373 and H.R. 6463 Before the House Comm. on the Judiciary,* 77th Cong., 2d Sess. 35 (1942) (emphasis added). Besides the fact that it is common practice to give deference to the contemporaneous interpretation of the department responsible for drafting a statutory provision, *see Vermont Yankee Nuclear Power Corp. v. NRC,* 435 U.S. 519,

546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978), Assistant Attorney General Shea's testimony happens to be the only portion of the legislative history relied upon by the Supreme Court in the one case it has decided dealing with this aspect of the FTCA. *See Spelar,* 338 U.S. at 220–21, 70 S.Ct. at 11–12. It can hardly be thought, of course, that the "good deal of difficulty" which Mr. Shea envisioned from deciding a case under a law other than that of this country would be at all reduced when that other law is nonexistent. It may be that, for reasons I discuss in the immediately following paragraph of this opinion dealing with similar statements in judicial opinions, Mr. Shea's testimony is ultimately inconclusive. But to the extent that this sole authoritative portion of the legislative history proves anything, both its language ("restrict the bill to claims arising in this country") and its rationale ("otherwise, ... a good deal of difficulty") are only compatible with the interpretation the majority has rejected.

### Prior Case-Law

Most of the decided cases involving § 2680(k) are not really helpful to the question before us, since none of them involved a situation such as this, in which *not only* does United States law not apply, but *also* the law of no foreign jurisdiction applies as well. To be sure, dicta uttered without contemplating this issue can be quoted on both sides. The majority, for example, quotes the statement in *Spelar* that the purpose of § 2680(k) is to prevent the United States from being subject to "liabilities depending upon the laws of a foreign power," 338 U.S. at 221, 70 S.Ct. at 12. And I could quote language from the same case to the effect that "[b]y the exclusion of claims 'arising in a foreign country,' the coverage of the Federal Tort Claims Act was geared to the sovereignty of the United States," and that "[t]he amended version [*i.e.,* the version amended pursuant to the Justice Department's proposals] identified the coverage of the Act with the scope of United States sovereignty." 338 U.S. at

219, 220–21, 70 S.Ct. at 11, 12.[8] But to be honest about it, none of these dicta proves anything. In the context of that case (as in the context of almost all the other cases) the phrase "liabilities depending upon the laws of a foreign power" could have been elliptical, leaving out the implied conclusion "and therefore not depending upon the laws of the United States"; just as the phrase "geared to the sovereignty of the United States" could have been elliptical, leaving out the implied conclusion "and therefore depending upon the laws of a foreign power." There is in fact no way of telling whether the *nonapplicability* of United States law or the *applicability* of foreign law was crucial to the Court's thinking—and indeed it seems highly unlikely that either the *Spelar* court or most of the other courts cited by the majority had any intent whatever on the point.[9]

A few cases, however, contain holdings which, on the assumptions adopted by the rendering courts, are inconsistent with the majority's thesis that a country is "foreign" only if foreign law applies. *Meredith v. United States*, 330 F.2d 9 (9th Cir.), *cert. denied*, 379 U.S. 867, 85 S.Ct. 137, 13 L.Ed.2d 70 (1964), involved an FTCA claim based upon a negligent act allegedly occurring in the United States embassy in Bangkok, Thailand. The court held the claim to be barred by § 2680(k) *without definitively concluding that foreign law was applicable*. Pertinent portions of Judge Browning's opinion are as follows:

> [O]bviously our embassy at Bangkok has no tort law of its own. *Presumably* the law applicable on these premises would be that of Thailand. . . . If this is so, the words "in a foreign country" in section 2680(k) must be read to include the embassy buildings and grounds or liability of the United States for acts of its employees will be determined by the law of a foreign power, contrary to the purpose of Congress.

> In any event, other possible reasons for the exclusion by Congress from the Federal Tort Claims Act of claims "arising in a foreign country" argue forcefully against the construction of section 2680(k) suggested by appellant. Judge Sobeloff has stated these reasons as follows: "the absence of United States courts in such countries, with resulting problems of venue, and the difficulty of bringing defense witnesses from the scene of the alleged tort to places far

---

**8.** For other cases containing equivalent dicta, *see, e.g., Burna v. United States*, 240 F.2d 720, 722–23 (4th Cir.1957) (approving the formulation that "[w]hen the Congress speaks of 'foreign state,' it means a country which is not the United States or its possessions or colony,—an alien country,—other than our own"); *Bell v. United States*, 31 F.R.D. 32, 35 (D.Kan.1962) ("the term 'foreign country' . . . as used in the *exception to the Federal Tort Claims Act* means all lands other than those within the boundaries of the United States and those territories and possessions referred to in Title 48 of the United States Code Annotated"); *Straneri v. United States*, 77 F.Supp. at 241 (footnote omitted) ("when Congress used the term 'foreign country,' it meant all lands other than those for which it is the supreme legislative body. That is, as one of the conditions precedent to recovery from the United States, the tort must have been committed on lands within the boundaries of the United States or its territories and possessions. All other lands are to be considered as foreign country irrespective of the degree of control the executive branch of the United States government might otherwise exert over them"); *Brunell v. United States*, 77 F.Supp. 68,

72 (S.D.N.Y.1948) ("Congress by the term 'foreign country' in the Federal Tort Claims Act, limited the operation of the Act to areas which were actually a component part or political subdivision of the United States").

**9.** The district court decision in *In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 1242, 1254 (E.D.N.Y.1984), contains a perplexing statement, quoted by the majority at pages 97–98, seeming to suggest that the substantive law of the country where a tort occurred cannot be applied, and that the country therefore cannot be considered a "foreign country," if that country has since ceased to exist as a functionally independent sovereign. It is, as the majority acknowledges, unclear how much of a role this reasoning played in the court's decision—but the reasoning produces such unacceptable results that one must charitably presume it played no role at all. It is inconceivable that whenever a nation in which the United States has caused personal injury is conquered, the United States not only becomes liable under the FTCA where it was immune before, but becomes liable under a retroactively different substantive law!

removed; and * * * a reluctance to extend the Act's benefits to foreign populations." *Burna v. United States*, 240 F.2d 720, 722 (4th Cir.1957). Obviously, each of these considerations is equally applicable whether a tort occurs in Bangkok within the American Embassy or outside the Embassy grounds.

. . . .

Finally, without attempting an exhaustive catalogue or detailed analysis, we note that provisions of a number of other statutes (see, e.g. 10 U.S.C.A. §§ 2734 and 2734(a); 5 U.S.C.A. § 170g(b) and (f); 42 U.S.C.A. § 2473(b)(13); 22 U.S.C.A. § 2509(b)) point to a Congressional intention that claims for property damage, personal injury, or death arising out of activities of our military and civilian personnel abroad are to be dealt with by administrative or diplomatic means, or by special legislation, as may be appropriate, rather than by litigation under the Federal Tort Claims Act.

330 F.2d at 10–11 (emphasis added). This holding, arrived at without a conclusive determination that United States substantive law was not applicable, is incompatible with the majority's analysis.

So also is the holding of the Fourth Circuit in *Burna v. United States*, 240 F.2d 720 (1957), which involved an FTCA claim arising from an alleged negligent act on Okinawa while the United States had, by treaty, "the right to exercise any and all powers of administration, legislation and jurisdiction" over that island. *Id.* at 721. Here again the court did not determine whether Japanese or United States law was applicable to the tort. It said:

Though the absence of any United States sovereignty was a sufficient answer in Spelar, the transfer temporarily of a measure of sovereignty here is not sufficient to dissolve Okinawa's status as a foreign country. The reasons assigned by the Supreme Court were pertinent and sufficient to dispose of the case then before it; they do not necessarily exhaust the concept that underlies the statute. The Court's reasons should be read

as the bases, within the statute, for the decision in that case, and we do not think that they were meant to be treated as comprehensive and exclusive, or to establish a rigid formula for all cases.

. . . .

We find persuasion in the language of Judge Yankwich, in *Hichino Uyeno v. Acheson*, [96 F.Supp. 510, 515 (W.D. Wash., N.D.1951)]. In interpreting a similar phrase, he said: " * * * it is obvious that the words 'foreign state' are not words of art. In using them, the Congress did not have in mind the fine distinctions as to sovereignty of occupied and unoccupied countries which authorities on international law may have formulated. They used the word in the sense of 'otherness.' When the Congress speaks of 'foreign state,' it means a country which is not the United States or its possessions or colony,—an alien country,—other than our own, bearing in mind that the average American, when he speaks of a 'foreigner' means an alien, non-American. * * * So here, the interpretation called for is that of common speech and not that derived from abstract speculation on sovereignty as affected by foreign military occupation."

240 F.2d at 721–23.

Neither the analysis of these cases, *nor their holdings* (since they did not find foreign law applicable), can be squared with the majority's decision here. To my knowledge, the interpretation I propose neither creates a circuit conflict nor requires the positing of nonexistent findings of law to avoid one.

### III. THE "HEADQUARTERS" ALLEGATIONS DO NOT ELIMINATE APPLICATION OF § 2680(k)

I believe the foregoing discussion establishes that any claim arising in Antarctica arises in a "foreign country" for purposes of § 2680(k), and is therefore not maintainable against the United States. The question I turn to in this section is whether the appellants' allegation of negligence in the training, selection and supervision of the air traffic controllers sent to Antarctica—

which negligence allegedly occurred in the United States—either (1) suffices to establish that the entire claim arises in the United States, or (2) constitutes a separate claim that arises in the United States.[10] I turn to the second part of this question first.

### Only a Single Claim is at Issue

The majority acknowledges that all elements of the present complaint present "a single cause of action," but contends that the cause of action contains "two claims." Maj. op. at 104; *see also* Wald op. at 131.[11] This strange usage accords neither with common understanding nor with what internal and external evidence establishes as the meaning of "claim" in the FTCA. The term "claim" in § 2680(k) is at least as broad as, if not broader than, the concept "cause of action."

Shortly before the adoption of the FTCA, Congress had revised the Federal Rules of Civil Procedure, substituting the word "claim" for the phrase "cause of action" wherever it appeared. The intent was to embrace the broadest meaning of the earlier phrase. As Judge Swan observed three years before the FTCA was enacted:

> For the traditional and hydra-headed phrase "cause of action" the Federal Rules of Civil Procedure have substituted the word "claim." It is used to denote the aggregate of operative facts which give rise to a right enforceable in the courts.

*Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.*, 133 F.2d 187, 189 (2d Cir.1943) (footnote omitted). Or as the Supreme Court later described the development:

> With the adoption of the Federal Rules of Civil Procedure and the unified form of action, Fed.Rule Civ.Proc. 2, much of

the controversy over "cause of action" abated.... Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties....

*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In a case cited by *United Mine Workers* as exemplifying the (if anything more limited) meaning of the *earlier* phrase, the Supreme Court had specifically said: "The mere multiplication of grounds of negligence alleged as causing the same injury does not result in multiplying the causes of action." *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 321, 47 S.Ct. 600, 602, 71 L.Ed. 1069 (1927). *See also Rhodes v. Jones*, 351 F.2d 884, 886–87 (8th Cir.1965), *cert. denied*, 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673 (1966) (citation omitted) ("Under the Federal Rules of Civil Procedure, the word 'claim' denotes the same thing [as 'cause of action'], *i.e.*, 'the aggregate of operative facts which give rise to a right enforceable in the courts' ").

The lawyers who drafted § 2680(k) were unquestionably aware of this general meaning of the newly prominent word "claim," and unquestionably used it in that sense not only in § 2680(k), but elsewhere in the FTCA. Section 2672, for example, provides that acceptance of an administrative award "shall constitute a complete release of any *claim* against the United States ... *by reason of the same subject matter*" (emphasis added). And § 2675(a) provides that suit cannot be instituted "upon a claim" unless the plaintiff "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied." If the word is interpreted as the majority would have it

---

**10.** The District Court ruled that the "headquarters" allegations did not relate to "discretionary functions" excluded from the FTCA by 28 U.S.C. § 2680(a). *Beattie*, 592 F.Supp. at 784 n. 25. This issue was not raised and has not been considered on appeal. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, —— U.S. ——, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

**11.** The majority and concurrence reach this issue in the context not of § 2680(k) but of 28

U.S.C. § 1346(b), dealing with jurisdiction and choice of law. The latter section provides "jurisdiction of civil actions on claims against the United States ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." I discuss the § 1346(b) issue specifically at pages 127–129, *infra*.

("a single cause of action with two grounds for relief (two claims)," Maj. op. at 104), then it is highly questionable whether the headquarters "claim" is properly before us, since the notice provision is jurisdictional, *see Bialowas v. United States,* 443 F.2d 1047, 1049 (3d Cir.1971), and since the headquarters allegations were not even made in court until the amended complaint. *Compare* Complaint, ¶ 28(a)-(d), *with* Amended Complaint, ¶ 28(a)-(e).

Practical considerations relating to § 2680(k) in particular reinforce this meaning of the statutory language. Since suits against the government on the basis of actions of its employees are *ex hypothesi* based upon actions *in the course of those employees' official duties, see* 28 U.S.C. § 1346(b), it will virtually always be possible to assert that the negligent activity that injured the plaintiff was the consequence of faulty training, selection or supervision—or even less than that, lack of careful training, selection or supervision—in the United States. And regard for malpractice liability, if nothing else, will induce plaintiffs' lawyers regularly to include such an assertion in their complaints—for who can tell, at least until full discovery, where it is that proper training or supervision did *not* occur? Thus, the so-called "headquarters claim" will become a standard part of FTCA litigation involving the activities of federal employees abroad,[12] and few such suits will be able to be dismissed at the jurisdictional threshold. I think it unlikely that the exclusion of "claims arising in a foreign country" was meant to operate in this fashion. To the contrary, it seems to me that the intent of Congress was to insulate the government from claims for injuries caused by its employees abroad, whether or not those employees' actions can in turn be attributed to actions or inactions by other employees stateside.

No one would contend that a single injury caused by a private employer, through various "separate acts or omissions" by various "separate sets of actors" in his employ, would produce a multiplicity of "claims." *See, e.g.,* RESTATEMENT (SECOND) OF JUDGMENTS § 24 (1982). There is no reason for treating the government's liability differently, or for attributing a novel meaning to the word "claim" in the FTCA. The authorities the majority and concurrence rely upon for the notion that there are really two § 2680(k) "claims" involved here represent narrow exceptions to the ordinary meaning of the term, unrelated to the policies at issue here. Thus, comment c to the RESTATEMENT (SECOND) OF JUDGMENTS § 26 (1982) states:

> The general rule [against splitting of a claim] is largely predicated on the assumption that the jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of the litigant's presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law. When such formal barriers in fact existed and were operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present *those phases of the claim* which he was disabled from presenting in the first.

(Emphasis added.) Comment c gives as an example the ability to sue in federal court under a federal statute on a claim that has already been rejected under state law theories in the state courts. In my view (and evidently in the RESTATEMENT's) it is more precise to describe this situation as involv-

---

12. Of the relatively few recent FTCA cases involving injuries abroad, at least five have included allegations of "headquarters" negligence producing tortious action by a government agent abroad. *See,* in addition to the present suit, *Pelphrey v. United States,* 674 F.2d 243 (4th Cir.1982); *Leaf v. United States,* 588 F.2d 733 (9th Cir.1978); *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 1242 (E.D.N.Y. 1984); *Bryson v. United States,* 463 F.Supp. 908

(E.D.Pa.1978). Of course there is also an incentive to use the "headquarters claim" in purely domestic FTCA litigation, to obtain the benefit of different substantive law, *see, e.g., Ducey v. United States,* 713 F.2d 504 (9th Cir.1983), or to avoid the application of other exceptions to the FTCA, *see, e.g., Shearer v. United States,* 723 F.2d 1102 (3rd Cir.1983), *cert. granted,* — U.S. ——, 105 S.Ct. 321, 83 L.Ed.2d 259 (1984).

ing two separate "phases of a claim" rather than two separate "claims." But even if the latter terminology is used, there is no basis for making such an exception from the general rule in the circumstances of this case.[13]

### The Claim Arose in Antarctica

Since, then, only a single "claim" is involved, one would think that the next question would be in what place that single "claim" arose. It is at this point that Judge Wald's expressed willingness to assume *"arguendo"* that only a single claim is involved, Wald op. at 132, turns out to be a promise kept to the ear but broken to the heart. It is easy to assume a single claim, so long as one attaches no legal consequences to the concept—which is perhaps why the concurrence regards the matter of one versus more claims to be "no more than a semantic quibble," *id.* at 132. Specifically, Judge Wald would find it possible to hold that a unitary claim both arises in a foreign country and does not arise in a foreign country; and that the choice of law governing liability under the unitary claim is determined by the rules of Antarctica yet also determined by the rules of the District of Columbia.

There is a semantic quibble afoot here— but it does not pertain to whether a unitary claim is a unitary claim. Rather, it pertains to whether it makes any difference for Judge Wald to achieve the result she desires by frankly admitting (no *arguendo* about it) that she is fragmenting a unitary claim; or rather by calling it a unitary claim but depriving that concept of all reasonable consequences. It seems to me that when a statute refers to a place at which a unitary claim arose, it refers to a unitary

place. It will not do to reject this approach as "inappropriate" because "it results in completely denying plaintiffs a forum for pursuing their claim," Wald op. at 133. Since the whole object of the provision we are construing *is* to deprive plaintiffs of a forum, it is hardly a useful or even a rational approach to reject ordinary meanings because they produce such a result.

The claim fragmentation or deprivation of the legal consequences of claim unity that the concurrence engages in (whichever of the two characterizations one chooses) has important consequences not merely with regard to determining whether a "claim arose" in a foreign country for purposes of § 2680(k); and not only, as we shall see, for purposes of the choice-of-law applicable to the claim under § 1346(b); but also for purposes of virtually all of the exemptions in § 2680. In one line of cases, for example, which is now the subject of a petition for certiorari that has been granted by the Supreme Court, plaintiffs have attempted to apply Judge Wald's technique to the exemption contained in § 2680(h), which excludes "any claim arising out of" various specified intentional torts. There also, one would assume that the unitary claim either arises out of the intentional tort or does not. Plaintiffs have sought to avoid the bar against intentional tort suits, however, just as the concurrence here would avoid the bar against foreign claims, by splitting the claim or denying the consequence of its unitary nature. Specifically, they have alleged the equivalent of "headquarters negligence" in the government's training, selection, or supervision of the employee who committed the intentional tort. I will discuss these cases in more

---

**13.** Perhaps an exception is appropriate in the rare situation in which *independently operative* acts of negligence, one in the United States and another abroad, are asserted to have caused the same injury—for example, negligent repair of an airplane part in the United States and negligent repair of a different part in France, both of which independently contribute to an accident. In such a case, it may be that for purposes of the "domestic-versus-foreign-claim" jurisdictional issue under § 2680(k), as for purposes of the "federal-versus-state-claim" jurisdictional issue

in the example from the RESTATEMENT OF JUDGMENTS discussed in text, an exception to the rule against claim splitting may be required. But that necessity need not be reached—and it would indeed frustrate the purpose of § 2680(k) to reach it—in a case such as this, which involves *not* independently operative acts of negligence, but rather a dependent series of acts which take effect only through the ultimate failure of the controllers in Antarctica to conform to requisite standards.

detail below, *see* pages 124–125, *infra*, but mention them here merely to note the broad consequences of the approach the concurring opinion adopts.

I proceed, then, to discussion of the question whether the locus of the present unitary claim is the United States or Antarctica. The issue can be precised somewhat further, in accordance with this court's analysis in *Sami v. United States*, 617 F.2d at 762 n. 7:

> Each of the exemptions contained in § 2680 begins with the words "any claim." In all except § 2680(k) these words are followed by a description of acts or omissions exempted. Thus § 2680(a): "Any claim based upon an act or omission of an employee of the Government, exercising due care, [etc.]"; § 2680(e): "Any claim arising out of an act or omission of any employee of the Government in administering the provisions of sections 1–31 of Title 50, Appendix."
>
> We do not think the omission of a specific reference to acts or omissions in § 2680(k) was meaningful or that the focus of that exemption shifted from acts or omissions to resultant injuries. What must be *in* a foreign country under the exemption is, we think, not a "claim arising" but "an act or omission of an employee of the government."

Pursuant to this analysis, and assuming, as discussed above, that the single claim cannot be fragmented, we are faced with the necessity of selecting an "act or omission" to determine the issue of FTCA jurisdiction.

Since this is a suit for negligence, the first selection that comes to mind is that "act or omission" (in the chain of events producing the injury) which was blameworthy. But it is readily apparent that this solution cannot work. While it might fortuitously provide an answer in some circumstances, in the ordinary case there may be *several* points along the chain of causality at which genuine "fault" on the part of a government employee occurred; or perhaps *no* point at which the unquestioned fault can be located—as where negligence is established through the doctrine of *res ipsa loquitur*. In the present case, for example, the controllers may have been erroneously trained, but they may also have been inattentive to their duties at the time of the crash. In such circumstances the assignment of fault provides no basis for determining where the unitary claim arose. Moreover, establishing the particular location or locations of fault is often realistically impossible when the fault consists of an "omission" rather than an "act." For instance, if the real fault in the present case was that the controllers received no training whatever, where *is* it that a blameworthy federal employee *failed* to provide them training? In addition, determining where the claim arose on the basis of where government employee "fault" occurred would have the same harmful practical effect as permitting fragmentation of the single claim: "Headquarters fault" would always be pleaded, and the jurisdictional issue would rarely be resoluble at the outset. Finally and most importantly, resolving the issue on the basis of employee fault would produce results incompatible with plausible congressional intent. If an air crash in this country were caused by a military air traffic controller's failure to comply with an applicable objective standard of behavior, it is impossible to imagine that the United States could plead as a complete defense that the controller was simply acting in accordance with negligent training received at the Rhein-Main military base in the Federal Republic of Germany.

I think, therefore, that one must look to some test other than the allocation of individual employee fault. It is, after all, not liability of individual employees we are assessing in these cases, but liability of the United States. The relevant "act or omission" is the act or omission *of the United States* that caused the harm. In a case where it is claimed that one or more elements of negligence by federal employees affected the plaintiff through the failure of a particular federal action, or of a particular condition that should have been reme-

died by federal action, to comply with requisite standards, the place of the relevant "act or omission" is the place where that operative noncompliance occurs—regardless of whether any specific "blame" can be attributed to any particular federal employee at that point. Thus, if it is claimed that an accident was caused by a government car making a left-hand turn without signalling, it would not matter whether the government-employee driver was negligent in failing to activate the turn signal, or whether he had been negligently trained to turn without signalling at some other location, or whether he in fact activated the signal which did not work because of negligent servicing by government employees at yet a third location; the "act or omission" occurred where the alleged breach of standard that injured the plaintiff took place.[14]

The rule that a claim "arises" for purposes of § 2680(k) where there occurs the alleged violation of standard (attributable to government action or inaction) nearest to the injury serves to further one of the primary purposes of the provision—to avoid the application of foreign law against the United States. For whatever law may be applied to other elements of the claim, the crucial question of standard-violation in the government action immediately producing the injury is almost certain to be governed by the law of the place where that alleged violation occurred. Suppose a traffic accident is caused in a foreign country by a federal employee, acting within the scope of his duties, who makes a right turn at a red light. Suppose further that such action complies with the traffic rules of the District of Columbia, where such employee was selected and trained, but does not comply with the law of the foreign country. Even if negligence in the selection and training is asserted, surely under anyone's choice-of-law theory the crucial question, central to recovery, of whether the employ-

ee failed to comply with an objective standard of conduct would be governed by the law of the place where that alleged failure occurred. By making the same criterion the test of whether the claim arises in a foreign country, we most effectively achieve § 2680(k)'s purpose of avoiding the application of foreign law.

Persuasively analogous authority rejecting a "place of fault" criterion and adopting essentially the test I have set forth above is to be found in a Supreme Court decision determining whether a particular tort suit came within the constitutional grant of federal power over "Cases of admiralty and maritime Jurisdiction," U.S. CONST. art. III, § 2. In *The Admiral Peoples*, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935), the libelant had been injured while disembarking from a vessel, by falling from a gangplank leading from the vessel to the dock. The shipowner asserted that admiralty jurisdiction did not exist because, among other reasons, the alleged acts of negligence consisted of improper construction of the gangplank, and improper placing of the gangplank against the ship—acts which occurred on shore. After acknowledging that "[w]here the cause of action arises upon the land, the state law is applicable," 295 U.S. at 651, 55 S.Ct. at 886, the Court disposed of the issue as follows:

> We perceive no basis for a sound distinction because her fall was due to negligence in the construction or placing of the gangplank. By reason of that neglect, as the libel alleges, she fell from the plank and was violently thrown forward upon the dock. Neither the short distance that she fell nor the fact that she fell on the dock and not in the water, alters the nature of the cause of action which arose *from the breach of duty owing to her while she was still on the ship and using its facility for disembarking.*

14. I emphasize that this test does not focus on the place where the injury occurs, but on the place where the proximate breach of duty producing that injury takes place. It is thus in no way inconsistent with the "operative effect" cases discussed in the majority opinion at 96–

97 and in the concurrence at 132. A claim against the government for negligence that causes injuries overseas is not barred so long as, with regard to those elements of negligence that operate in a single, dependent chain of causality, the last link is in this country.

*Id.* at 652, 55 S.Ct. at 886 (emphasis added). Thus, the place of standard-violation, rather than the place where the negligence occurred, governed.

Analogous support can also be found in *Richards v. United States, supra*, which involved the issue of where the "act or omission occurred" not for foreign-tort immunity purposes, but rather for purposes of determining which state's law was applicable under the choice-of-law provision of the FTCA, 28 U.S.C. § 1346(b). There the plaintiffs sought damages for deaths in an airline crash allegedly attributable to the FAA's failure to assure adequate overhaul practices at American Airlines' depot in Tulsa, Oklahoma. The Supreme Court's opinion simply assumed (as apparently did the parties) that the place where the "act or omission occurred" was Tulsa. It nowhere appears in the opinion, however, that any individual federal employee was actually "negligent" or even was actually present at that particular location; and I think it most unlikely that the governing law would have changed if the reason for noninspection at Tulsa was a decision in Washington not to send FAA employees to Oklahoma. Rather, it seems to me that the "omission" within the meaning of the statute occurred there because it was there that the unlawful and injury-producing condition that a federal employee should have acted to remedy existed—even though the genuinely operative decision not to remedy it may have occurred all the way up the chain of command and causality, in Washington.

In a recent case involving FTCA liability of the United States for an "omission," the Ninth Circuit adopted (again for choice-of-law rather than "foreign claim" purposes) an analysis substantially similar to that which I have suggested (and, incidentally, incompatible with the majority's choice-of-law approach):

Since an omission, by its very definition, is an act which failed to occur, an allegedly negligent omission cannot have actually "occurred" anywhere. Hence, Congress must have intended the applicable law under § 1346(b) in regard to a negligent omission to be that of the place where the act necessary to avoid negligence should have occurred....

Here, plaintiffs have alleged numerous wrongful or negligent omissions, including a failure to close down the facility and a failure to post signs. While these omissions may have stemmed in part from decisions made in San Francisco, California, the omissions could have been prevented only by the doing of such physical acts as the posting of signs, the erection of barbed wire, and the tearing up of boat slips and trailer spaces in Nevada. Contrary to plaintiffs' contention that California law applies to this case, the omissions "occurred" in Nevada, and Nevada whole law (including Nevada choice of law principles) governs the determination of liability of the United States.

*Ducey v. United States*, 713 F.2d 504, 508 n. 2 (9th Cir.1983).[15]

---

**15.** Judge Wald seeks to distinguish *Ducey* on the ground that it "only states where to locate the place a particular *omission* occurred for choice of law purposes; it says nothing about cases involving multiple acts or omissions." Wald op. at 139 n. 7. But in fact *Ducey* clearly involved "multiple omissions." *See* 713 F.2d at 508 n. 2 ("Here, plaintiffs have alleged numerous wrongful or negligent omissions"). Perhaps, then, Judge Wald is suggesting that *Ducey* is somehow inapposite since it does not speak to the location of negligent *acts*. That would seem a strange distinction, suggesting that the "decisions made in San Francisco, California," which the *Ducey* court rejected as a basis of choice of law, 713 F.2d at 508 n. 2, were somehow non-acts. But even if such a distinction were accepted it would not distinguish the present case, which at

least equivalently involves not acts but omissions. Appellees claim that personnel of the United States were negligent in "failing to warn Flight 901 that it had deviated from the customary flight plan," Amended Complaint ¶ 28(b), and "in the failure ... to use due care in the selection, training and supervision of the Naval personnel at McMurdo Base," *id.* at ¶ 28(e). As for the Ninth Circuit's later opinion in *Grunnet v. United States*, 730 F.2d 573 (1984), that is in no way inconsistent with *Ducey* since it involved not a chain of dependent causality such as was involved in *Ducey* and is involved here, but independent alleged omissions which did not combine to take effect through the ultimate act or omission of a single government agent. *See* note 13, *supra.*

Finally, closely analogous support can be found in those cases, alluded to above, which have rebuffed the attempt to convert an intentional tort (excluded from suit under the FTCA by § 2680(h)) into a negligent tort by reliance upon a claim of "headquarters negligence." Some of these opinions apply reasoning quite similar to that I have set forth above, as the following examples indicate:

> It is true that the claim here is predicated on negligence. However, that negligence would have been without legal significance absent the alleged [subsequent intentional tort]. Without that, there would have been no actionable negligence. It was the attack which served to attach legal consequences to the defendant's alleged negligence.

*Collins v. United States,* 259 F.Supp. 363, 364 (E.D.Pa.1966).

> The alleged negligence of the government employee in retaining [the perpetrator] Sullivan was not the proximate cause of the assault. The proximate cause of the assault is the willful and intentional act of Sullivan.... True, the third count does allege that ... the negligent keeping of [Sullivan] in his employment and the failure to transfer was the proximate cause of the assault. But there would have been no assault except for the separate and independent acts of Sullivan. Without his independent assault, there would be no cause of action. It is to this action the statute does not waive immunity.

*Hughes v. Sullivan,* 514 F.Supp. 667, 670 (E.D.Va.1980), *aff'd* "for reasons adequately stated by the District Court" *sub nom. Hughes v. United States,* 662 F.2d 219, 220 (4th Cir.1981). *See also Wine v. United States,* 705 F.2d 366, 367 (10th Cir.1983); *Naisbitt v. United States,* 611 F.2d 1350, 1353–56 (10th Cir.), *cert. denied,* 449 U.S. 885, 101 S.Ct. 240, 66 L.Ed.2d 111 (1980); *Gale v. United States,* 525 F.Supp. 260 (D.S.C.1981); *Taylor v. United States,* 513

F.Supp. 647, 649–53 (D.S.C.1981); *Pennington v. United States,* 406 F.Supp. 850, 851–53 (E.D.N.Y.1976); *Davidson v. Kane,* 337 F.Supp. 922, 923 (E.D.Va.1972). The Court of Appeals for the Third Circuit has taken a contrary view in two cases, *Shearer v. United States,* 723 F.2d 1102 (3d Cir.1983), *cert. granted,* —— U.S. ——, 105 S.Ct. 321, 83 L.Ed.2d 259 (1984), and *Gibson v. United States,* 457 F.2d 1391 (3d Cir.1972).[16] In the former of these, as noted earlier, the Supreme Court has accepted *certiorari.* If the approach adopted by *Shearer* is rejected by the Supreme Court for purposes of § 2680(h), I think it clear that it must also be rejected for purposes of § 2680(k)—and if adopted for the one, then also adopted for the other. While relying for the present upon the weight of authority regarding the § 2680(h) issue in support of my position here, I am hopeful that the Supreme Court's disposition of *Shearer* will address the "headquarters claim" point, and thereby conclusively resolve the issue between the concurrence and me.

Judge Wald believes that cannot be, since "[i]n contrast [to § 2680(k) cases] the rationale for not holding the government liable on the basis of headquarters negligence in § 2680(h) cases is that the intentional, criminal act of the employee is the sole proximate cause of the harm and supersedes the headquarters negligence." Wald op. at 138, citing RESTATEMENT (SECOND) OF TORTS § 442(B) (1965). Even in theory, that cannot possibly be so. Any general tort rationale of "superseding cause" would surely be sought in the applicable state law, and not in the text of the FTCA. Moreover, if that were the principle explaining the § 2680(h) "headquarters" cases, it would apply as well to the intentional, criminal acts of *nongovernment employees;* but as correctly stated in one of the cases:

> It is by now well settled that where negligent performance of duties owed by the government to certain individuals

---

**16.** The district court opinion in *Bryson v. United States,* 463 F.Supp. 908, 912 (E.D.Pa.1978), relied upon by the concurrence, *see* Wald op. at

135, was an unreasoned holding relying upon *Gibson.* Its authoritativeness will suffer the same fate as that of *Shearer* on certiorari.

makes possible assaults on those individuals by *non-employees* of the government, § 2680(h) will not bar a negligence claim against the government (although an absence of proximate cause might of course still be found).

*Pennington v. United States*, 406 F.Supp. at 851, citing *Panella v. United States*, 216 F.2d 622 (2d Cir.1954) (Harlan, J.). Of course in order to recover a plaintiff must establish legally "proximate" cause *even if the bar of sovereign immunity does not apply*, and opinions in some suits against the government involving intentional torts choose to go off on this nonjurisdictional ground, *see, e.g., United States v. Shively*, 345 F.2d 294 (5th Cir.1965), *cert. denied*, 382 U.S. 883, 86 S.Ct. 177, 15 L.Ed.2d 124 (1965)—a phenomenon which some of the § 2680(h) cases fully acknowledge, *e.g., Naisbitt, supra*, 611 F.2d at 1355. But none of the § 2680(h) cases I have cited above nonsuiting the plaintiffs are "proximate cause" cases in this ordinary tort-law sense, and there is simply no basis for the concurrence's appeal to this doctrine as a means of deflecting in advance the Supreme Court's action in *Shearer*.[17]

The concurrence brings ordinary tort principals of "proximate cause" into the debate even more generally, asserting that my insistence upon selecting a single jurisdiction in which the claim arose is incompatible with those principles. Wald op. at 135–136. That is not so. I have no quarrel with such cases as *Ingham v. East-ern Air Lines, Inc.*, 373 F.2d 227, 237 (2d Cir.1967); the RESTATEMENT (SECOND) OF TORTS; and Dean Prosser; all cited by Judge Wald for the proposition that "where there are multiple, proximate concurrent or contributing causes, the courts do not arbitrarily choose the most proximate as the sole cause for purposes of liability with respect to FTCA claims." Wald op. at 135. I would not do so either, but that says nothing about the question whether, in the case of entirely sequential and dependent negligence such as we have here, the "most proximate" governmentally connected cause—or what perhaps should be called, in order to avoid confusion with the general tort doctrine, the "nearest cause"—should be chosen *for purposes of determining where the unitary claim arose*. For example, in the *Ingham* case that Judge Wald discusses, *see* Wald op. at 135, involving negligence by both pilots and air traffic controllers, I would permit either or both acts of negligence to be the basis of recovery. They are both "proximate causes" in the sense that they are not so remote as to be beyond the legally recognized chain of causality. The only issue is whether suit would be barred—not by reason of the "supervening cause" theory dismissed in *Ingham* but by reason ·of § 2680(k)—if the government negligence nearest to the injury occurred abroad. In other words, for purposes of determining where the unitary claim arises in the case of a chain of dependent causes,

---

17. I may add that the concurrence is not accurate in its description of the ordinary tort-law rule regarding proximate cause. It cites the RESTATEMENT (SECOND) OF TORTS § 442B (1965) for the proposition that "[a]s a general matter in tort law, the intervening intentional or criminal acts of third parties will break the chain of causation," Wald op. at 138. That is quite true as a general matter, but not true with respect to what we have described here as headquarters claims. Specifically, § 442B states that intervening action of a third person does *not* break the chain of causation "except where the harm is intentionally caused by a third person *and is not within the scope of the risk created by the actor's conduct*" (emphasis added). The comments to this section note that "tortious or criminal acts may in themselves be foreseeable, and so within the scope of the created risk, in which case the actor may still be liable for the harm...." RESTATEMENT (SECOND) OF TORTS § 442B comment c, at 471. *See also id.* at § 449; W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 44 at 275 (4th ed. 1971). Such an allegation of intervening acts "within the scope of the risk" is of course precisely what a headquarters claim consists of—whether the subsequent foreseeable action is merely negligent, or intentional so as to trigger § 2680(h). Unquestionably, most jurisdictions draw the scope of legally accountable foreseeability more narrowly for intentional (and especially for criminal) intervening acts, *cf. Romero v. National Rifle Association*, 749 F.2d 77 (D.C.Cir.1984), but that is a matter of application of the "scope of the risk" principle rather than a fundamental difference distinguishing the two categories of case.

I would genuinely refer to *the proximate* governmental cause—using the word "proximate" in its proper superlative sense of "nearest," as opposed to its usage for purposes of determining which acts in the chain can be a legal basis for liability, which latter usage admits of multiple "proximate" causes.

Judge Wald asserts that my analysis is contrary to the holding of the Ninth Circuit in *Leaf v. United States*, 588 F.2d 733 (9th Cir.1978). Wald op. at 133–135 & n. 3. Not so. In that case, the plaintiff brought an action against Bean, allegedly an informant for the Drug Enforcement Agency, and against the United States, for the loss in Mexico of a plane that had been leased from the plaintiff for the purpose (undisclosed to him) of conducting an undercover drug-trafficking operation. Bean thought the flight back from Mexico was to be a "practice run," but armed Mexicans overloaded the plane with marijuana, as a result of which it crashed on takeoff. The plaintiff asserted that this was the result of alleged acts of negligence by Bean in both Mexico and the United States, and by other alleged government agents in the United States. The district court had granted summary judgment for the government, based on its finding "that Bean was not an agent of the United States," that "the acts of nongovernment actors in Mexico were the sole proximate cause of the injury," and that the claim therefore arose in a foreign country. 588 F.2d at 735. The nub of the Ninth Circuit's reasoning in reversing is shown by the following excerpts from its opinion:

> The district court erred in deciding the proximate-cause question on a motion for summary judgment.
>
> . . . .
>
> The allegations of negligent acts in this country, and of the government's knowledge about Church and Bean, were suffi-

cient to raise reasonable questions about agency and proximate cause.

> . . . .
>
> Facts were alleged from which a trier might reasonably find proximate cause running from acts in this country to the damages suffered in Mexico. Such a finding would preclude dismissal on jurisdictional grounds. We express no opinion on the merits of these and other questions of fact, or on the defenses that might be asserted. The claim did not necessarily "arise in a foreign country". . . .

*Id.* at 736. On my analysis, if Bean was a government agent and his violation of a standard of care in Mexico was the "nearest governmental cause" in the sense I have defined, dismissal was proper. But if Bean was not a government agent and there was proximate causality (in the tort sense) traceable to the violation of a standard of care by a government agent only in the United States; or if Bean was a government agent, but it was in the United States that his last operative violation of a standard of care occurred; then dismissal was improper. Since on the disputed facts the plaintiff had to be given the benefit of the latter suppositions, the reversal was correct.[18] I think, in other words, that the *Leaf* court meant by "proximate cause" precisely what I mean by the last operative act of negligence. But the case is in any event in no way contrary to the analysis I have set forth.

Judge Wald also relies on *Pelphrey v. United States*, 674 F.2d 243 (4th Cir.1982). There a district court had rendered summary judgment against the plaintiffs on the grounds that the foreign country allegations were barred by § 2680(k) and that the headquarters allegations had no factual support. The court of appeals affirmed on the same grounds. If courts were fastidious about the impropriety of reaching mer-

---

**18.** *Knudsen v. United States,* 500 F.Supp. 90, 93 (S.D.N.Y.1980), cited by Judge Wald as supporting her interpretation of *Ledf,* in fact stands only for this limited point of giving the plaintiff the benefit of suppositions on a summary judgment motion. *See* 500 F.Supp. at 93 (dicta). In

any case, the citation of *Knudsen* displays a failure, repeatedly evident in the concurrence, to appreciate the difference between the sequential and dependent chain of causality that we have here, and independently operative acts. *See* note 13, *supra;* note 21, *infra.*

its issues without first establishing jurisdiction, it could be argued that this opinion implicitly holds that the occurrence of the "most proximate" negligence abroad did *not* dispose of the whole case. But courts are not so fastidious. *See, e.g., Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1101 (D.C.Cir.1985). It is obvious that the Fourth Circuit in *Pelphrey* did precisely what this court would probably have done—decided the case the simple way without even considering the complex issue here under discussion. Neither in what it says nor in what it does can the opinion provide any support for the concurrence.

Finally, I cannot allow to pass unchallenged the concurrence's assertion that my approach is "calculated ... to insure a result of non-suit in complex cases where non-suit may very well not be the result most attuned to congressional intent." Wald op. at 143. My approach happens to result in a non-suit in this case, but in other cases would avoid a non-suit which the concurrence's approach would produce. For example, to modify Judge Wald's hypothetical, *see* Wald op. at 142, if a defective backup system was installed in a government plane in Mexico and was negligently activated in the United States, my approach would allow an FTCA suit on the basis of both the backup system and its negligent activation while the majority's approach seems "calculated ... to insure a ... non-suit" with respect to the backup system.[19] Thus, if Judge Wald can write "Congress [did not] intend by the foreign country exception to sanction the government's exportation to foreign countries of poorly trained, unsupervised, or inept personnel with free license to injure unsuspecting residents of those countries," Wald op. at 143; I suppose I could reply that Congress did not intend to sanction the government's importation from foreign countries of poorly trained, unsupervised, or inept personnel with, under the majority's approach, free license to injure unsus-

pecting residents of this country so long as they follow instructions received overseas. But of course all such rhetoric is misdirected when one is dealing with a statutory provision which, in one manner or another, *is unquestionably intended to "sanction"* (if one chooses to put it that way) *governmental negligence.*

## IV. Even Assuming That Antarctica Is Not a Foreign Country, the Case Should Have Been Dismissed

What I have said above shows that this suit presents a single claim arising in Antarctica, which, since Antarctica is a foreign country, must be dismissed for lack of jurisdiction under § 2680(k). ·

Even if I thought that Antarctica is not a foreign country, however, I would disagree with the majority's disposition of this case, and with large portions of the majority's and the concurrence's analysis. I must set forth that disagreement at least briefly, since what the majority has said with regard to an FTCA claim straddling two (in its view) nonforeign jurisdictions is of great practical significance.

First, as my analogous use of *Richards v. United States* and *Ducey v. United States* in the immediately preceding discussion suggests, I think it no more valid to split a unitary claim such as this for purposes of the choice-of-law provision of the FTCA, 28 U.S.C. § 1346(b), than for purposes of the foreign claim exclusion. Neither of those choice-of-law cases (nor any other I am aware of in the 39-year history of the FTCA) even considered such a course—and in *Ducey* in particular the plaintiffs had specifically raised a "headquarters claim." Thus, it seems to me that what really confronts the majority (on its erroneous assumption that Antarctica is not foreign) is not the clear applicability of D.C. law to the so-called "headquarters claim" and a supposed choice-of-law problem for the "other" claim, but rather a

---

**19.** Judge Wald's assertion that this is "plainly wrong," Wald op. at 142 n. 9, is contradicted not only by analysis but also by her ensuing acknowledgement that "[t]he former [*i.e.*, acts or omissions occurring in Mexico] may be barred by the foreign country exception," *id.*

problem similar to that which I discussed in the immediately preceding section: which law applies to the entire suit?

To fragment a unitary claim for choice-of-law purposes as the majority would do creates needless and insoluble conflicts regarding applicable rules. Assume, for example, an FTCA suit by a resident of Virginia, alleging that a federal employee, also a resident of Virginia, while driving in the course of his duties a vehicle registered and garaged in that state, was involved in an automobile accident in West Virginia, in which the plaintiff was injured. The cause of the accident is alleged to be excessive speed of the federally driven vehicle, attributable to (1) the negligence of the driver, (2) negligent training of the driver at a federal training center in Maryland, and (3) negligent selection of the driver by federal supervisors in the District of Columbia. The problem which the majority's fragmentation of this unitary claim poses is that the three separate issues of standard of care will be governed by the whole law (including the conflicts law) of three different jurisdictions; so that issues *common to liability under all three "claims" of negligence* may be resolved differently depending upon which "claim" is at issue. Thus, for example, the court might have to find that since, on the "negligent driving claim," the law of West Virginia, where that negligence occurred, would apply an "interest analysis" choice-of-law approach, the law of Virginia would govern the issues of whether contributory negligence precludes recovery and whether the doctrine of "last clear chance" applies; while at the same time finding that on the "negligent training claim" the law of Maryland (where *that* negligence occurred) would use a "place of the accident" approach, and apply West Virginia's law to those same issues; and finding that on the "negligent selection claim" the law of the District of Columbia

(where *that* negligence occurred), would adopt a "best law" (so-called) principle and apply its own contributory negligence and "last clear chance" rules. *See generally* E. SCOLES & P. HAY, CONFLICT OF LAWS 550–602 (1984). Assuming that Virginia resolves both of these common issues to the plaintiff's advantage, West Virginia both of them to the defendant's advantage, and the District of Columbia one to the advantage of each, the process of deciding the case is not only absurdly complex but produces a disreputable result. Indeed, it will produce no result at all when all three alleged elements of governmental negligence are found to have caused the accident—unless the jury is given the impossible task of assigning a percentage of causation to each of three acts of negligence that are interdependent and concurrently operative. This is not, as Judge Wald suggests, merely a routine instance of the "veritable jungle" which modern choice-of-law rules have produced, Wald op. at 139. It is vegetation of an entirely new strain. None of the respectable or even disrespectable (if there can any longer be such a thing) theories of choice of law, and no case I am aware of, would apply the *whole law* of different jurisdictions to the various elements of a single cause of action. It is inconceivable that Congress positively intended such contortion.[20]

Judge Wald suggests a more "flexible" approach to choice-of-law. I have no difficulty with the flexibility involved in permitting a court to consider first whether the choice-of-law rules of each connected state refer to the same law. If that is so, it is obviously unnecessary to decide which jurisdiction § 1346(b) points to. *See* the four cases discussed in the paragraph at page 140 of the concurrence. Judge Wald believes, however, that "where a true conflict of law problem is encountered after looking

---

**20.** Though the FTCA venue provision, 28 U.S.C. § 1402(b), contains language similar to that of § 1346(b) (referring to the place "where[ ] the act or omission complained of occurred"), I express no opinion whether it likewise should be given a "unitary" interpretation. As the Supreme Court noted in *Richards,* addressing precisely the argument that these two sections must be given parallel construction, "considerations underlying the problem of venue are substantially different from those determining applicable law," 369 U.S. at 10 n. 20, 82 S.Ct. at 591 n. 20.

to the whole law of each place where an act or omission occurred, courts may either apply the law of each place to the acts occurring in that place *or by some formula choose one place such as the place where the most significant act or omission occurred*," Wald op. at 141 (emphasis added). That degree of flexibility is the issue here. In my view the court must "choose one place." It is interesting that the only court of appeals decision cited by the concurrence in support of its choice-of-law analysis in fact supports mine. *Bowen v. United States*, 570 F.2d 1311 (7th Cir.1978), discussed by the concurrence at pages 140–141, *did* feel the necessity of selecting a single jurisdiction. To be sure, it did not, as the concurrence notes, adopt the test for selection of jurisdiction I have proposed. But there is no reason why it should have done so, since the case did not involve acts of sequential and dependent causality—*i.e.*, the negligence of one actor that ultimately has its effect only through the negligence of another—but rather three independently operative negligent acts.[21] I need not decide what act I would select in such a situation; indeed, it could even be argued that the necessity of selecting a single jurisdiction is not as great when independent causality is at issue. The latter consideration would distinguish *Kohn v. United*

*States*, 591 F.Supp. 568 (E.D.N.Y.1984), which also involved independently operative acts. In any case, to the extent that *Bowen* has any relevance to the present case, it supports my single-jurisdiction approach rather than the approach of the concurrence.

My other disagreements with the majority's analysis (accepting its assumption that Antarctica is not foreign) are of lesser consequence, since they relate to the relatively rare situation—created only by the majority's resolution of the Antarctica issue—in which the choice-of-law provision of the FTCA refers to a jurisdiction that has no law. Were I to create for myself the necessity of dealing with such a situation, I would not conclude, as does the majority, that I was confronted with a "question" of what law to apply—"a question not answered by the statute," Maj. op. at 105, and therefore requiring the court to devise an *alternate* choice-of-law rule. To the contrary, it seems to me no question is posed at all. According to the statute, we have jurisdiction only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).[22] It is clear that under the cir-

**21.** The concurrence's response to this analysis, *see* Wald op. at 140 n. 8, displays a belief that acts of negligence are dependent in the sense I have described whenever the absence of one of them would have prevented the other from causing the injuries complained of. That is not my meaning. Acts of negligence can be independently operative even though they are not independently effective. Thus, in *Bowen,* the negligence of the air traffic controllers at the earlier airports *independently* contributed to the crash by causing the wings to ice—though that condition would not alone have been enough to produce the crash if not combined with the erroneous weather and landing information independently provided by the controllers at the last airport. We are here concerned, however, with *dependently operative* acts, in which an earlier act of negligence has no effect *except that of producing the subsequent breach of standard* which alone causes the injury. Indeed, in the typical headquarters claim the negligence of the earlier act precisely *consists of* nothing more than its predictable creation of the conditions for the later act. That is not *Bowen.*

**22.** Professor Davis has suggested in another context that the limitations of § 1346(b) can be evaded by reliance upon a provision of the FTCA, 28 U.S.C. § 2674, which states that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 5 K. Davis, Administrative Law Treatise § 27:8, at p. 46 (2d ed. 1984). However, the Supreme Court in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), held to the contrary. Professor Davis attributes *Dalehite,* and a subsequent decision explicitly upholding the reasoning of *Dalehite, Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), to the fact that the Court "did not cite § 2674. It was apparently unaware that § 2674 made the United States liable 'in the same manner and to the same extent as a private individual under like circumstances.'" 5 K. Davis, *supra,* § 27:8, at p. 48. In fact, however, *Dalehite did* cite § 2674—not in the paragraph dealing with the controverted application of § 1346(b), but earlier on the same page. *See* 346 U.S. at 44, 73 S.Ct.

cumstances of this case, a private person would not be liable to the claimant in accordance with the law of Antarctica. It is therefore clear that we have no jurisdiction. Converting this plain answer into a "question" is not only incompatible with the rule that a waiver of sovereign immunity must be "unequivocally expressed," *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980), but distorts the intent of the statute by making the United States liable where a private person would not be.

I suppose it must be regarded as fortunate that the majority's decision to replace the choice-of-law rule of the statute with those of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, Maj. op. at 105, led to the District of Columbia in the present case. But one must fear that the circumstances of the next Antarctica case (or perhaps a revision of the RESTATEMENT) will lead next time to the substantive law of the Soviet Union. If that happens, one wonders whether the consequence will be to convert Antarctica (for purposes of that case) into a "foreign country" (since foreign law would then be applicable) with the result that the suit will be dismissed; or rather to set the court off in search of another nonjurisdiction to replace RESTATEMENT (SECOND), which will perhaps once again lead to the United States substantive law. I am tempted to confess that a decision which produces such endlessly interesting ramifications cannot be all bad.

\* \* \* \* \*

Even insofar as the majority's holding regarding the nonforeign status of Antarctica is concerned, this is not necessarily the "one-of-a-kind" case Judge Wald believes and I would like to hope. Antarctica is a dangerous land. "[A]n uncomfortably large number of the buildings and facilities at McMurdo are named for those who died here, and crosses stand silhouetted on the black hills." M. Parfit, *The Last Continent*, SMITHSONIAN, Oct. 1984, at 48, 56. Fifty-one aircraft of this nation alone have

been lost in Antarctica since 1946. *Id.* at 57. Tourism in Antarctica is particularly hazardous, and "[s]ome scientists believe that [it] should be banned," P. QUIGG, *supra*, at 103; *see also id.* at 101 (noting accidents of Antarctic tourist ship). The fact that what few activities take place in Antarctica are governmental activities or are heavily dependent upon governmental activities for their support, suggests that this may not be the last multi-million dollar tort suit against the world's deepest of pockets, arising from events in that desolate region, to which we will be asked to apply the local law of the District of Columbia.

But not even the hope of "one-of-a-kind" can be held forth for those portions of the decision permitting dismemberment of a unitary and assertedly *non*foreign FTCA claim. That analysis will unquestionably cause confusion in determining the choice of law for domestic FTCA tort claims in the future. On all counts, I dissent.

WALD, Circuit Judge, concurring:

When Congress enacted the Federal Tort Claims Act (FTCA), it obviously did not consider the legal ramifications of torts committed by civilian personnel in Antarctica and, of course, made no specific provision for such an action. *Cf.* Antarctica Conservation Act of 1978, 16 U.S.C. § 2404(e) (including special venue provision). As a result,

> This is one of those cases that a judge is likely to leave by the same door through which he enters. As we have been told by a master of our craft, *"Some theory of liability, some philosophy of the end to be served by tightening or enlarging the circle of rights and remedies, is at the root of any decision in novel situations when analogies are equivocal and precedents are silent."*

*Dalehite v. United States*, 346 U.S. 15, 49, 73 S.Ct. 956, 975, 97 L.Ed. 1427 (1953)

---

at 972. It does not seem to me reasonable to assume that the Supreme Court was "unaware" of the text of a provision that it explicitly cited. Nor does it seem to me reasonable (as evidently it does not to the Supreme Court) to give the language of § 2674 an interpretation contradicting § 1346(b), when a perfectly natural interpretation consistent with it is available.

(Jackson, J., dissenting) (quoting Cardozo, The Growth of the Law, at 102).

Upon weighing the relevant factors, I find Judge Wilkey's and Judge Greene's judgment call as to whether this one-of-a-kind case ought to fall within the "foreign country" exception to the FTCA more persuasive than Judge Scalia's counter-position. As Justice Frankfurter stated in *United States v. Spelar*, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949), the only Supreme Court case directly interpreting the FTCA foreign country exception:

> To assume that terms like "foreign country" and "possessions" are self-defining, not at all involving a choice of judicial judgment, is mechanical jurisprudence at its best. These terms do not have fixed and inclusive meanings, as is true of mathematical and other scientific terms. Both "possessions" and "foreign country" have penumbral meanings, which is not true, for instance, of the verbal designations for weights and measures. It is this precision of content which differentiates scientific from most political, legislative and legal language.

*Id.* at 223, 70 S.Ct. at 13 (Frankfurter, J., concurring). I fully concur in Judge Wilkey's opinion that Antarctica is not a "foreign country" within the meaning of the FTCA, 28 U.S.C. § 2680(k), and see no cause to elaborate further upon his reasoning. I write separately to address the novel and, I believe, unjustified conclusions about choice of law and viability of FTCA actions that the dissent draws from its conceptualization of the cause of action in the present case as a "unitary claim."[1] The dissent would have this court apply a mechanical yardstick for determining where *"the* unitary act or omission" occurred in every FTCA action to the end that *no* cause of action would be recognized in this case or in many other multilayered negligence cases because some of the alleged negligent activities occurred in a foreign country. I find this attempt to impose one monolithic formula for deciding where a FTCA claim arose when the claim is based upon multiple acts or omissions not only in direct conflict with precedent but potentially mischievous in its consequences as well.

As Judge Wilkey states, *see* Maj.Op. at 101, this is essentially a single cause of action based upon a single claim of injury—wrongful death—resulting from the plane crash. Nonetheless, there are two alleged grounds of negligence: (1) the "headquarters claims" based upon the negligent selection, training, and supervision of the air traffic controllers by government personnel in Washington, D.C.; and (2) the "Antarctica claims" based upon the negligent acts or omissions of the air traffic controllers in Antarctica. Thus there are two separate allegations of negligence committed by two separate sets of actors at different points in time which either singly or in concert allegedly caused the plane crash.

Judge Scalia, in my view, has misread his FTCA map and thus has taken an unnecessary and unenlightening detour through the Federal Rules of Civil Procedure and the Restatement (Second) of Judgments in order to prove that there is only one FTCA *claim* in this case. *See* Dissent at 118–120. While there is no simple test for determining when claims are separate, I tend to agree with him that in this instance the plaintiffs would have run afoul of the rule against splitting claims had they decided to bring separate or successive actions. *See Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 321–22, 47 S.Ct. 600, 602–03, 71 L.Ed. 1069 (1927) ("The injured respondent was bound to set forth in his first action for damages every ground of negligence ... upon which he relied, and cannot be permitted ... to rely upon them by piecemeal in successive actions to recover for the same wrong and injury."); *cf. Tolson v. United States*, 732 F.2d 998 (D.C. Cir.1984) (Where FTCA claim was predi-

---

**1.** Thus, this concurrence is written to address some of the points raised by Judge Scalia which Judge Wilkey's opinion stating the court's rationale did not find it necessary to treat in detail. I am authorized to state that Judge Wilkey fully agrees with this concurring opinion in support of the court's decision.

cated on three alleged grounds of negligence—the acts of a prison guard, negligent supervision, and negligent retention—dismissal of the claim based on the acts of the prison guard under Fed.R.Civ.P. 54(b) was not a final appealable judgment since this was not a separate claim and relief could still be granted upon one of the two remaining grounds.). Nevertheless, whether plaintiffs in this case stated two *claims* for relief or two *grounds* for relief is no more than a semantic quibble [2] and certainly not the real sticking point between Judge Scalia and myself. Thus, to join issue at the outset, I accept *arguendo* that this is a single cause of action or a single claim for wrongful death alleging two grounds for relief based upon two negligent acts or omissions.

Where I part company with Judge Scalia is with respect to the unwarranted conclusions he draws from the assumption that there is but one wrongful death claim here. For Judge Scalia relies on this assumption to launch a new and restrictive theory of FTCA liability: if there is a unitary claim, even though it is based on multiple acts of negligence, then the court *must* choose only one act or omission for purposes of determining *the place* where *the entire claim* arose. To locate that one special place where the one governing act or omission occurred, the dissent formulates a standard which can be restated simply as follows: The place of the relevant act or omission is the place where the most proximately operative failure to comply with standards occurs—regardless of whether any specific blame can be attributed to any particular federal employee at that point. *See* Dissent at 122. Application of this standard in the present case, of course, precludes relief altogether because the most proximate act or omission occurred in the Antarctica which Judge Scalia argues is

a foreign country, or, even if it is not, provides no law under which to determine FTCA liability. Judge Scalia's standard, or indeed the requirement that there be only *one* place where a multicausative "claim" arose, is neither grounded in the language of the FTCA nor consistent with existing precedent.

Indeed to reach his chosen destination, Judge Scalia has to put aside his FTCA map and rely on sign posts which he himself has erected. As this court has recognized "[t]he entire scheme of the FTCA focuses on the place where the negligent or wrongful act or omission of the government employee occurred." *Sami v. United States*, 617 F.2d 755, 761 (D.C.Cir.1979) (citing § 1346(b)). With respect to the foreign country exemption, section 2680(k), we have said: "What must be in a foreign country under the exemption is, we think, not a 'claim arising' but 'an act or omission of an employee of the government.'" *Id.* at 726 n. 7. Similarly, the operative effect cases, *see* Maj.Op. at 96, have soundly rejected the approach of locating the situs of the relevant acts or omissions at the place where the acts or omissions had their operative effect or came to fruition (i.e., where the claim arose). For jurisdictional and choice of law purposes, the FTCA focuses on the place where the acts or omissions upon which the claim is based occurred. I find nothing in the FTCA to indicate that a single claim cannot be based upon multiple acts or omissions or that *one governing* act or omission must always be identified. As the Supreme Court pointed out in *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962), Congress apparently focused on cases where all the relevant events including the injury occurred in one jurisdiction and never explicitly considered cases where the

---

**2.** Generally courts deciding FTCA cases have not perceived a need to be overly literal in their use of the word "claim." *See, e.g., Pelphrey v. United States*, 674 F.2d 243 (4th Cir.1982) (referring to alleged negligent acts of Navy doctor in the Philippines as "claims arising from actions in the Philippines," and referring to allegations of negligent selection and supervision as "claims

arising from actions within the United States."); *Loge v. United States*, 662 F.2d 1268, 1274 (8th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982) ("we find that *claims* have been stated under any one of the three alternative grounds for liability ....") (emphasis added).

relevant events occurred in more than one place. Merely asserting that there is a single claim here does not compel any particular answer to the very practical question left completely open by the FTCA: How should courts decide jurisdiction and choice of law questions when there are multiple acts or omissions occurring in different places?

To answer this question, the court need not pursue a singleminded, literalistic search for the one place where the one governing act or omission occurred. In fact, such an approach is particularly inappropriate where, as in this case, it results in completely denying plaintiffs a forum for pursuing their claim. As the Supreme Court has admonished:

> We think that the congressional attitude in passing the Tort Claims Act is ... accurately reflected in Judge Cardozo's statement in *Anderson v. Hayes Construction Co.*, 243 N.Y. 140, 147, 153 N.E. 28, 29–30: "The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced."

*United States v. Aetna Surety Co.*, 338 U.S. 366, 383, 70 S.Ct. 207, 216, 94 L.Ed. 171 (1949). Indeed when confronted with complex multistate or multinational tort actions, courts have for the most part adopted a more flexible approach which takes into account those acts or omissions—be they single or multiple—having operative significance in the case.

With respect to the present action, it is true that any negligence on the part of government personnel in Washington, D.C. in the selection, training or supervision of the air traffic controllers will be manifest only through the actions of those air traffic controllers. Nonetheless, there are still two separate allegations of negligence committed by separate sets of actors: one based on acts or omissions occurring in Washington, D.C., and one based on acts or omissions occurring in the Antarctica. The primary cause of the plane crash may have

been inattentiveness on the part of the air traffic controllers or the primary cause may have been inadequate training in the use of the radar equipment. The mere fact that the alleged inadequate operation of the radar equipment by the air traffic controllers occurred in Antarctica does not negate the fact that the core, contributing act or omission of providing inadequate training which led to the plane crash may have been committed by personnel in Washington, D.C. I see no rationale in the statute or elsewhere in our jurisprudence for disregarding separate negligent acts or omissions—albeit connected in a chain of causation—committed by separate sets of actors in determining liability for the ultimately resulting harm. Indeed, to do so, in my view, conflicts with both existing precedent in analogous cases and traditional principles of tort law, and potentially leads to undesirable results for claimants with no offsetting benefits for judicial administration.

I. ANALOGOUS SECTION 2680(k) CASES

Decisions by other courts in analogous cases involving alleged acts or omissions occurring both in the United States and a foreign country do not support Judge Scalia's position that choice of law and even jurisdiction of the whole claim in section 2680(k) cases must be determined by a "last clear chance" theory of where the "one relevant act or omission" occurred.

In *Leaf v. United States*, 588 F.2d 733 (9th Cir.1978), the plaintiffs, owners of a plane damaged in Mexico, appealed from a summary judgment granted in favor of the defendant United States. The claim of governmental negligence was rooted in actions of an alleged agent of the Drug Enforcement Agency (DEA), Bean, who leased and used plaintiffs' airplane in a drug smuggling operation, and the DEA's failure to supervise and control Bean. These alleged negligent acts occurred in California and Arizona. The plane, however, was damaged in Mexico as a result of other negligent acts occurring in Mexico: overloaded with marijuana, it crashed on take-off and was subsequently sunk in a

reservoir to prevent its discovery by police. The district court held that Bean was not a government agent and that the acts of non-government actors in Mexico were the sole proximate cause of the loss since their intervening conduct broke the chain of causation between alleged negligent acts in the United States and ultimate injury in Mexico. Thus, since the relevant acts or omissions occurred in Mexico, the FTCA claim was barred by the foreign country exception. Noting that "[a] claim 'arises,' as the term is used in Sections 1346(b) and 2680(k), where the acts or omissions that proximately cause the loss take place," the Ninth Circuit reversed the district court, stating:

> The allegations of negligent acts in this country, and of the government's knowledge about ... Bean, were sufficient to raise reasonable questions about *agency* and *proximate cause.*
>
> ....
>
> ... Facts were alleged from which a trier might reasonably find proximate cause running from acts in this country to the damages suffered in Mexico. Such a finding would preclude dismissal on jurisdictional grounds.... The claim did not necessarily "arise in a foreign country" under the uniform interpretation of that statutory language by the courts, and summary judgment was improper.

*Id.* at 736 (emphasis added). Yet, under the dissent's monolithic approach toward locating *the* place where the last govern-

ment omission occurred, this case would have to be dismissed on jurisdictional grounds.[3]

Similarly, in *Pelphrey v. United States,* 674 F.2d 243 (4th Cir.1982), the plaintiff brought an FTCA claim against the United States for damages arising from a radical mastectomy performed at the Navy Regional Medical Center (NRMC) in the Philippines. The plaintiff's claim alleged wrongful acts of the surgeon which occurred in the Philippines and wrongful "headquarter" acts of the Navy which occurred in the United States. With regard to the latter, the plaintiff specifically alleged that the Navy had been negligent in the selection of the doctor and in the administration of NRMC with respect to providing adequate supervision, staff, and equipment. The court affirmed the district court's dismissal with respect to the alleged negligent acts of the surgeon in the Philippines since these were barred by the foreign country exemption. Since this was the last proximate act of negligence under Judge Scalia's approach, the inquiry should have ended here. Instead, the court went on to consider the allegations of negligent selection, supervision, and administration which occurred in the United States. The court ultimately concluded that the district court's grant of summary judgment was proper but only "[b]ecause Ms. Pelphrey failed to present any evidence, in the form of affidavits, depositions, or otherwise, to refute the government's affidavits demon-

---

3. Judge Scalia creatively . argues that the *Leaf* court had *in mind* as its definition of "proximate cause" his standard of the "last operative act of negligence." *See* Dissent at 126. Absent clairvoyance, this assertion cannot be definitively proved or disproved. Suffice it to say, I find it more reasonable to assume that the *Leaf* court had in mind the traditional tort law view of "proximate cause" which is decidedly not "the last operative act of negligence." *See infra* p. 136. *Cf. Knudsen v. United States,* 500 F.Supp. 90, 93 (S.D.N.Y.1980) (Under FTCA standard, if every negligent act proximately causing damage occurs outside the United States, then section 2680(k) bars assertion of a claim, "[h]owever, where an issue of fact exists with respect to whether negligent acts proximately causing damage occurred both in the United States and in a foreign country, summary judgment may not be granted under Section 2680(k). *Leaf v. United States,* 588 F.2d 733 (9th Cir.1978).")." If, on remand, Bean was determined to be a government agent, thus subjecting the government to an FTCA action, proximate cause questions would arise as to whether "headquarter" acts and domestic and foreign acts of Bean either singly or in combination caused the harm. Surely the most proximately operative failure to comply with standards was committed by Bean during his several days in Mexico before the crash. I see no reason to believe that the court meant acts of negligence in the United States could circumvent the foreign country exemption only if Bean had committed no negligent acts in Mexico.

strating that the Navy had complied with the standards regarding the qualifications of Dr. Street and accreditation of NRMC...." *Id.* at 248.

Finally in *Bryson v. United States,* 463 F.Supp. 908 (E.D.Pa.1978), the court rejected the government's motion to dismiss for lack of jurisdiction in an action alleging that the government's negligence was a proximate cause of a serviceman's death where he was killed by a fellow, intoxicated serviceman whom he attempted to help out of the men's room in a barracks in Germany. Although the most proximate alleged claims of negligence occurred in Germany, *i.e.,* providing intoxicating beverages and failing to guard against excessive intoxication and its consequences, and were thus barred by the foreign country exception, the court held:

> However, to the extent that plaintiff alleges that the specific decision to admit Private Weidenhammer [into the Army] and/or the subsequent failure to remove him constituted negligent conduct [in light of his background of emotional problems] by the United States, this court has jurisdiction to consider [the] complaint. This alleged act of negligence occurred within the United States....

*Id.* at 912. Again the dissent's approach would have precluded jurisdiction in this case. I suggest that these cases show Judge Scalia's FTCA jurisprudential notion about the need for identifying a single act or omission to be without ancestry in FTCA law.[4]

## II. TRADITIONAL TORT PRINCIPLES RELATING TO PROXIMATE CAUSE

Traditional tort law principles as well suggest that, where there are multiple, proximate concurrent or contributing causes, the courts should not arbitrarily choose

the most proximate as the sole cause for purposes of determining liability with respect to FTCA claims but should look instead to the various acts or omissions which proximately caused the harm. The Second Circuit, for example, in *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227 (2d Cir.), *cert. denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967), rejected the government's contention that it was relieved of liability predicated upon air traffic controllers' failure to provide up-to-date weather information because the crew of the plane subsequently negligently failed to execute a "missed approach maneuver." Although *Ingham,* unlike the section 2680(k) cases discussed above, does not involve a "headquarters claim" in the United States followed by subsequent acts of negligence in a foreign country, it clearly illustrates the application of well-accepted proximate cause principles. Finding the acts of the air traffic controllers a proximate and concurrent cause of the accident, the court stated:

> We are unable to conclude that the accident was not reasonably foreseeable as a result of the government's negligent failure to provide up-to-date weather information. Indeed, the government was the original wrongdoer whose negligence set in motion the entire chain of events which finally culminated in the tragic crash. The government's negligence was ever present.

*Id.* at 237 n. 11.

Similarly, the Sixth Circuit, in a case involving the parachute deaths of sixteen sky divers, made clear that concurrent or subsequent negligence did not exonerate the government. *See Freeman v. United States,* 509 F.2d 626 (6th Cir.1975). The court found that the air traffic controller's negligent act caused the pilot to believe that he was over the parachute jump tar-

**4.** Lest Judge Scalia remain confused, *see* Dissent at 126 & n. 18, I do understand the distinction he attempts to draw between sequential and interdependent acts in a chain of causality and independently operative or efficacious acts. What I do *not* understand is why that distinction alone demands or even supports adoption of a set of principles for determining FTCA liability that while "fastidious" indeed (*i.e.,* "having high and often capricious standards," *see* Webster's New Collegiate Dictionary (1981)), bears no discernible relationship to the language, 39 year history, or purposes of the FTCA.

get. The consequence of this act continued during the entire sequence of events so that the subsequent negligence of the pilot and jump master did not alone cause the drowning of the jumpers. The subsequent acts of negligence were not independent intervening causes but instead produced the injury in cooperation with the original wrong.

In general, case law recognizes that the United States can be held liable in tort in airplane crash cases if *any* negligent act of a government employee was *a* proximate cause of the injury. *See also Delta Air Lines, Inc. v. United States*, 561 F.2d 381, 389, 394 (1st Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Hartz v. United States*, 387 F.2d 870, 873–74 (5th Cir.1968); *Thinguldstad v. United States*, 343 F.Supp. 551, 553 (S.D. Ohio 1972). Under traditional proximate cause doctrine, any substantial factor in causing the harm is *a* proximate cause to which liability attaches, not just the last proximate act which could have prevented the harm. The Restatement (Second) of Torts § 442 B (1965) states:

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

*See also id.* at §§ 431, 433, 443, 447 (establishing that defendant is liable if negligent conduct is a substantial factor causing the harm); W. Prosser, Handbook of the Law of Torts § 41, at 240 (4th ed. 1971) ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result...").

Although Judge Scalia has "no quarrel" with the cited authorities on proximate cause he apparently fails to understand the relevance of the authorities. *See* Dissent

at 125. If Judge Scalia can assert that, "[t]he lawyers who drafted § 2680(k) were unquestionably aware of this general meaning of the newly prominent word 'claim,' and unquestionably used it in that sense ... in the FTCA," *see* Dissent at 118, then I believe that they also were unquestionably aware of general principles of tort law. And, even if they had no glimmer of the concept of proximate cause, the FTCA specifically incorporates state and common law tort principles. As the Supreme Court noted in *Richards:*

> It is evident that the Act [FTCA] was not patterned to operate with complete independence from the principles of law developed in the common law and refined by statute and judicial decision in the various States. Rather, it was designed to build upon the legal relationships formulated and characterized by the States, and, to that extent, the statutory scheme is exemplary of the general interstitial character of federal law.

369 U.S. at 6–7, 82 S.Ct. at 589–590. Thus, it is fair to assume that the words "act or omission" in the FTCA refer to acts or omissions which have operational significance in the case according to traditional tort law principles, *i.e.*, acts or omissions which proximately caused the harm. While the FTCA does not explicitly address cases involving multiple acts or omissions occurring in different places, I submit that the "reasonable judge," when faced with the question of how to apply the FTCA in such a case, would look to FTCA cases and traditional principles of tort law to find an answer rather than creating an arbitrary rule of her own completely lacking any foundation in relevant law or precedent. Under well-established principles of proximate cause, when there are multiple acts or omissions, liability attaches to each act or omission which is a substantial factor in causing the harm, not just the *most proximate* or last act or omission. Thus, Judge Scalia's standard which determines, and in this case precludes, liability solely on the basis of the most proximate act or omission, regardless of its relative significance, in the chain of events culminating in the

ultimate harm is totally out of sync with traditional tort principles which attach liability to any act or omission which is a substantial factor in causing the harm.

Judge Scalia, however, asserts that analogous support for his standard can be found in cases construing the intentional tort exemption of the FTCA. 28 U.S.C. § 2680(h) (specifically excluding claims arising out of an assault and battery committed by a government employee). In the cited cases, the plaintiffs allege that an injury or death was caused by the intentional, and usually criminal, act of a government employee, and that the government was somehow negligent in failing to prevent the harm (*e.g.*, by discharging the employee, supervising the employee, or warning the victim). Since liability predicated on intentional torts of government employees is barred by section 2680(h), the issue is whether the government may nonetheless be held liable in these cases based upon the alleged headquarter negligence. The answer to this question has tended to turn on the specific facts of the case. The Third Circuit recently addressed the question and concluded:

> The FTCA does not necessarily bar a cause of action in negligence, even if the injury is directly caused by the assault and battery of a government employee. The FTCA simply requires that the intentional tort must "have its roots in government negligence," *Gibson v. U.S.*, 457 F.2d 1391, 1395–97 (3d Cir.1972); *Underwood v. U.S.*, 356 F.2d 92, 99–100 (5th Cir.1966). Recovery under this exception could thus be barred if the negligence was a remote cause of the injury, or if the plaintiff, through artful pleadings with conclusionary allegations, attempts to create a negligence issue. *Gibson v. U.S.*, 457 F.2d at 1395–96. *See also Hughes v. Sullivan*, 514 F.Supp. 667, 669–70 (E.D.Va.1980), *aff'd sub nom., Hughes v. U.S.*, 662 F.2d 219, 220

(4th Cir.1981); *Naisbitt v. U.S.*, 611 F.2d 1350, 1354–55 (10th Cir.1980); *U.S. v. Shively*, 345 F.2d 294, 296–97 (5th Cir. 1965).

*Shearer v. United States*, 723 F.2d 1102, 1106–07 (3d Cir.1983), *cert. granted*, —— U.S. ——, 105 S.Ct. 321, 83 L.Ed.2d 259 (1984). The court then went on to hold that:

> In this case, appellant's allegations, if proven, would permit a court to find that the government's negligence proximately caused Shearer's injury, thus, this case falls closer to the rubric of *Gibson* facts, not to that of *Naisbitt*. We therefore reject the United States' contention that summary judgment was justified under Section 2860(h), the intentional tort exception.

*Id.* at 1108. The Supreme Court has granted *certiorari* on *Shearer*, which Judge Scalia construes as a signal that the Supreme Court will vindicate his view that claims should not be allowed to go forward on the basis of allegations of headquarter negligence where the final act resulting in harm comes within one of the FTCA exemptions. The Supreme Court's ultimate disposition of *Shearer* is purely a matter of speculation especially since the case also involved a claim that government liability was precluded under the *Feres* doctrine. *See Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (barring claims where injury is "incident to military service").[5]

In any event, the ultimate disposition of *Shearer* will not illuminate the appropriate path of analysis for this court to take in the present case. Judge Scalia, by adamantly refusing to acknowledge the relevance of traditional proximate cause principles in construing the FTCA and cases thereunder, has misconstrued the import of the section 2680(h) cases with respect to the present action. In the present case, if the govern-

---

**5.** Specifically the questions presented are stated as:

> (1) May survivor of serviceman who was murdered by another serviceman while off duty and off base sue government for dam-

ages under FTCA? (2) Does Feres doctrine preclude suit by survivor alleging that negligence of serviceman's superior officers was responsible for murder?

53 U.S.L.W. 3244 (Oct. 2, 1984).

ment did negligently select and negligently train the air traffic controllers then the natural and foreseeable consequence is the negligent performance of those air traffic controllers. The government's negligent selection and training is *a,* if not *the* most, substantial factor causing the harm and thus is a proximate cause of the harm. In contrast, the rationale for not holding the government liable on the basis of headquarter negligence in section 2680(h) cases is that the intentional, criminal act of the employee is the sole proximate cause of the harm and supersedes the headquarter negligence. A claim involving a superseding intentional act is entirely different than a multilayer negligence claim.

As a general matter in tort law, the intervening intentional or criminal acts of third parties will break the chain of causation. *See* Restatement (Second) of Torts § 442B, *supra* p. 136. (Intervening force does not generally relieve original negligent actor of liability "except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct."); *cf. Romero v. National Rifle Ass'n of America,* 749 F.2d 77, 79 (D.C.Cir.1984) (Scalia, J.) ("when the intervening act involves *criminal,* rather than *negligent,* conduct by a third party, the ability to anticipate (or foresee) the intervention with the normally required degree of specificity is not enough," a duty to guard against the harm must exist). The dissent in *Shearer* stated:

> Indeed, there would have been no assault here except for the "separate and independent" act of Heard. Such an intervening act (here, the intentional assault and murder) has been held to be of such significance that even if the Army had initially been negligent, the subsequent act renders the negligence insignificant as a causal force.

*Shearer,* 723 F.2d at 1111 n. 5 (Garth, J., dissenting) (citations omitted). Later the dissent distinguished *Loritts v. United States,* 489 F.Supp. 1030, 1032 (D.Mass. 1980), where an FTCA action based on the rape of a member of a choral group performing at West Point by a cadet was held

not barred by section 2680(h) because the "attack was ... not an intervening cause but rather, was a foreseeable result of the defendant's breach" of its voluntary undertaking to protect the female choral group. The dissent states:

> ... In *Loritts,* the district court expressly found that the Academy had voluntarily undertaken the task of providing escorts to the choral group, and having assumed that responsibility, its failure to carry out that obligation subjected the Government to liability. Indeed, the district court, acknowledging those cases which seek to circumvent section 2680(h) by artful pleading, addressed that very issue and found that such was not the situation in *Loritts'* case.

*Shearer,* 723 F.2d at 1112 n. 6 (Garth, J., dissenting).

Thus even if the dissent's view in *Shearer* were to prevail in the Supreme Court it would still not provide support for Judge Scalia's view that liability should be precluded in this multilayer negligence case. The air traffic controllers' alleged negligence is not necessarily an independent superseding act constituting the sole proximate cause of the plane crash. If the plaintiffs' can prove their allegations of negligent selection, training, and supervision then the negligent performance of the air traffic controllers in Antarctica is a natural and foreseeable result of the government's headquarter negligence making that headquarter negligence a proximate cause of the plane crash.

## III. CHOICE OF LAW

Pursuant to section 1346(b), the liability of the United States is determined "in accordance with the law of the place where the act or omission occurred." Once again, however, the statute says nothing about what law governs when there are multiple acts or omissions occurring in more than one state or country. Judge Scalia gives a hypothetical example to illustrate the "parade of horribles" which results if his standard of locating the *one place,* where the

unitary act or omission occurred, is not adopted[6] at least for choice of law purposes. *See* Dissent at 127–28. He suggests that applying the whole law of each jurisdiction where an act or omission occurred in a multi-layered negligence case would result in a whole new dimension of chaos in choice of law. This is nothing more than a restatement of the well-recognized complexity of the choice of law problem in multistate or multinational tort actions. *See, e.g., Forsyth v. Cessna Aircraft Co.,* 520 F.2d 608, 609 (9th Cir.1975) (referring to "the wilderness in which courts sometimes find themselves when searching for solutions to problems arising under the judicial nightmare known as Conflict of Laws."); *In re Paris Air Crash,* 399 F.Supp. 732, 739 (C.D.Cal.1975) ("The law on 'choice of law' in the various states and in the federal courts is a veritable jungle....."). Even if this court felt the need to construct a single approach to the

problems of FTCA claims involving acts or omissions occurring in multiple places, and chose to do it in the context of a case as factually unique as the present one, I caution against a rule which is patently inconsistent with traditional tort principles and existing precedent.[7]

The only Supreme Court case addressing the choice of law problem under FTCA is *Richards.* There the Court held only that the FTCA requires application of the whole law of the place where the act or omission occurred, including its choice of law rule. Thus, the question here is not which substantive law will apply but which choice of law rule will apply. In *Richards,* the Court, after observing that Congress apparently did not consider choice of law problems in enacting the FTCA, stated:

> Despite the power of Congress to enact for litigation of this type [multistate] a federal conflict-of-laws rule independent

**6.** In my view, this court came very close to rejecting the dissent's approach to the choice of law question in *Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979). The court rejected the assertion that evidentiary difficulties and difficulties in ascertaining foreign law would be avoided if the place where the claim arose was determined by where the last event necessary to liability occurred. The court further concluded:

> Under prevailing choice of law principles, only if *all* torts with any foreign connections were exempted under § 2680(k) would the difficulties of finding evidence and ascertaining foreign law be avoided. This is not what Congress did in enacting § 2680(k).

*Id.* at 763 n. 11.

**7.** The only authority cited by Judge Scalia which provides any support for his proposed approach is *Ducey v. United States,* 713 F.2d 504 (9th Cir.1983). *Ducey* did hold that a negligent omission under § 1346(b) should be deemed to occur "where the act necessary to avoid negligence should have occurred." Thus, although the decision not to close the facility or post warning signs may have been made in part in California, the actual omission of not posting signs, etc. ... occurred in Nevada. *Ducey,* at most, only states where to locate the place a particular *omission* occurred for choice of law purposes; it says nothing about cases involving multiple acts or omissions. Although unclear at this juncture, the present case appears to involve both acts and omissions. *Ducey* was recently applied by the Ninth Circuit in *Grunnet v. United States,* 730 F.2d 573 (1984), an action for

wrongful death of a religious sect member in the Jonestown, Guyana tragedy. Four negligent acts or omissions were alleged. Two were found exempt under the discretionary function exemption, the remaining two were failure to warn the victim of the danger that the People's Temple posed to her and the failure to warn her relatives of the danger. Following *Ducey,* the court found the failure to warn the victim occurred in Guyana and was thus barred by the foreign country exemption. On the other hand, the failure to warn her relatives occurred in California where they lived and thus California law would apply. Thus, the last proximate failure does not locate the entire action, only the particular omission. In fact, in *Grunnet,* it would appear difficult to determine exactly what the last proximate failure was which should have prevented the harm—warning the victim or warning her relatives.

The dissent mischaracterizes the issue in *The Admiral Peoples,* 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935). The issue was whether there was admiralty jurisdiction which is determined by the "locality of the injury." Thus, the question was whether admiralty jurisdiction was lost because plaintiff fell from the gangplank, rather than the ship proper and landed on the dock rather than on the ship or in the water. Clearly, the case is inapposite.

Finally, *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), is not helpful since the case addressed only a claim of negligence occurring in Oklahoma. The court did not address a situation involving multiple acts or omissions occurring in different places.

of the States' development of such rules, we should not, particularly in the type of interstitial legislation involved here, assume that it has done so ... It seems sufficient to note that Congress has been specific in those instances where it intended the federal courts to depart completely from state law and, also, that this list of exceptions contains no direct or indirect modification of the principles controlling application of choice-of-law rules.

369 U.S. at 13–14, 82 S.Ct. at 593. Yet, Judge Scalia would read into section 1346(b) his own choice-of-law rule despite the Supreme Court's explicit admonition that we should not assume Congress has intended rules independent of controlling choice-of-law principles. As far as I can tell, despite Judge Scalia's unsupported assertion to the contrary, *see* Dissent at 128, in cases involving multiple acts or omissions occurring in different places, the courts have traditionally resolved the choice of law problems by applying the *whole* law of the place of each act or omission.

Looking to the whole law of the place of each act or omission will often result in no true conflict either because each place uses the same choice of law rule thus pointing to one body of governing substantive law or because, although the choice of law rules point to different places, the substantive law of each place is the same. In fact, in the majority of cases involving multistate activity and addressing the choice-of-law question the problem has resolved itself in one of these ways. For example, in *In re Silver Bridge Disaster Litigation*, 381 F.Supp. 931 (S.D.W.Va.1974), the court found that the acts or omissions occurred in possibly two or three locations and, thus, pursuant to *Richards*, the court should look to the law of West Virginia, Ohio, and the District of Columbia. The court concluded, however, that, because the substantive legal principles of each of the jurisdictions were not in conflict, the choice-of-law problem could be largely disregarded. In *Insurance Company of North America v. United States*, 527 F.Supp. 962 (E.D.Ark. 1981), where an airplane allegedly crashed due to the negligence of air traffic controllers in both Memphis, Tennessee and Blythville, Arkansas, the court looked to the whole law of both Arkansas and Tennessee. Since each state followed the *lex loci delicti* rule in negligence cases and the plane crashed in Tennessee, Tennessee law applied. *See also Suchomajcz v. United States*, 465 F.Supp. 474 (E.D.Pa.1979) (Though unclear from the complaint whether the negligent acts or omissions occurred in New York or Pennsylvania because Pennsylvania and New York have identical choice of law rules, under either jurisdiction Pennsylvania law applies.); *Kantlehner v. United States*, 279 F.Supp. 122 (E.D. N.Y.1967) (where acts or omissions may have occurred in any combination of nine states and seven states' conflict rules pointed to Maryland law and the remaining two states' rules pointed to New York, summary judgment could still be granted on all but one issue since the result would be the same under either Maryland or New York substantive law).

In these cases, the need to actually decide the choice-of-law issue was obviated. This may often turn out to be the case, but of course not always. At times, there will be true conflicts. In *Bowen v. United States*, 570 F.2d 1311 (7th Cir.1978), the pilot of a private aircraft brought an FTCA action against the United States alleging negligence on the part of air traffic control personnel at airports in three states for failure to warn of icing conditions in the vicinity of his final landing destination.[8] The district court had found all three states' choice of law rules would point to

---

**8.** Judge Scalia attempts to take this case out of his analysis by suggesting that the case involves three independently operative acts. *See* Dissent at 129. As the court itself noted in *Bowen*, if the air traffic controllers at the last airport had given the pilot the correct weather and landing information (*i.e.,* had not been negligent) the crash would not have occurred. *Bowen*, 570 F.2d at 1318. Apparently the line between independently operative acts and sequential and interdependent acts is an exceedingly fine one. *Cf.* Dissent at 120 n. 13.

the same substantive law. However, the Seventh Circuit on appeal noted that one of the states, Arkansas, had changed its choice of law rule and would now apply its own law which would create a true conflict. Noting that *Richards* shed no light on the question of which law to apply when acts or omissions occur in more than one state and cases where the need to decide the issue had been unnecessary, the Seventh Circuit stated:

> Excluding possibilities that would appear to be wholly arbitrary leaves the alternatives of the place of the last act or omission having a causal effect, or the place of the act or omission having the most significant causal effect. The former would have the advantage of certainty, as does the traditional conflicts rule of *lex loci delicti*, but the latter seems to us to be more consistent with statutory language and Congress' intent.

*Id.* at 1318. The court found that Indiana law would apply under either approach and that the pilot's contributory negligence barred the action. Thus, while the Seventh Circuit, in cases involving a true conflict of law problem, would apparently choose one governing act or omission for choice of law purposes, it would choose not the last act as Judge Scalia suggests but the act or omission having the most significant causal effect.

On the other hand, in *Kohn v. United States*, 591 F.Supp. 568 (E.D.N.Y.1984), the family of a serviceman shot by a fellow soldier brought a FTCA action against the United States for infliction of emotional distress caused by negligent acts of the Army occurring in Kentucky and New York with respect to the disposition of the decedent's body and notification of the family. The court concluded that it would "look to the choice-of-law principles of each state, New York or Kentucky, where an alleged tortious act or omission took place in order to determine the substantive law to apply to each claimed tort." *Id.* at 572. Looking to those choice-of-law rules, the court concluded that Kentucky law should apply to acts occurring in Kentucky and

New York law to acts occurring in New York and resolved the case accordingly.

The foregoing examples demonstrate that a flexible approach which takes account of all the acts or omissions having operative significance in a case, is the preferred approach and the one which has been followed by courts faced with complex causation cases. In many cases, no true conflict of law problem will be encountered. In those cases, where a true conflict of law problem is encountered after looking to the whole law of each place where an act or omission occurred, courts may either apply the law of each place to the acts occurring in that place or by some formula choose one place such as the place where the most significant act or omission occurred. I am confident our district court judges are up to the task.

In the present case, as well, it is unnecessary for us to decide how we would choose to resolve a case involving a true conflict. Alleged negligent acts or omissions occurred in the District of Columbia and Antarctica, thus, the court must look to the whole law of each place. In this novel case, Antarctica has no law, consequently there is no conflict of law problem. In my view, the majority's application of the whole law of the District of Columbia, under these circumstances, is clearly more in accord with FTCA precedent than Judge Scalia's approach which would coincidentally and to my view arbitrarily result in dismissing the action altogether at the outset.

The District of Columbia has adopted the "interest balancing" approach to choice of law problems which assesses the significant contacts. *See Hitchcock v. Hitchcock*, 665 F.2d 354, 359–60 (D.C.Cir.1981). In the present case, I think there is sufficient basis for this

> ... Court to conclude for purposes of this interim and limited ruling that officials acting at the Seat of the Government [may be] the ultimately responsible actors in the chain of circumstances and specific events which ended in the deaths and injuries here.... [T]he law of the

forum, which is the law enacted by Congress for the Seat of the Government, should be displaced only if some other jurisdiction has an overwhelming policy interest in applying its own law. *In re Air Crash Disaster Near Saigon,* 476 F.Supp. 521, 527 (D.D.C.1979) (citing *In re Paris Air Crash,* 399 F.Supp. 732, 745 (C.D.Cal.1975)). There is no conflict of law problem here or overwhelming policy interest of another forum in applying its law. Significant acts or omissions allegedly occurred in the District of Columbia making application of its law appropriate. *Cf. Hitchcock,* 665 F.2d at 359–69 (Although the vaccine resulting in the paralysis of a diplomat's wife was administered by a nurse in Virginia and that nurse failed to give the patient appropriate warnings and risk information, the locus of the negligent acts or omissions was in Washington, D.C. where the ultimate supervisory decisions were made and thus the D.C. choice of law rule applied.); *Gelley v. Astra Pharmaceutical Products, Inc.,* 610 F.2d 558, 560 (8th Cir.1979) (applying D.C. choice of law rule where the bulk of the FDA activity addressed in the complaint occurred in the District of Columbia).

Finally, Judge Scalia suggests that considerations of judicial administrability of the FTCA's "act or omission" language commends the adoption of his standard for determining where the *one governing act or omission* occurred. Specifically, he asserts that courts will find it easier to identify the last proximate act which should have occurred to prevent the harm than to identify the most "blameworthy" or significant act causing the harm. Even if I accepted the underlying assumption that one unitary act or omission must always be identified

in FTCA cases, which I do not, Judge Scalia's argument is still not persuasive. It may be just as difficult, if not more difficult to pinpoint the most proximate failure or omission which could have prevented the harm as to pinpoint the most significant or direct proximate cause of the harm. *See, e.g., supra* note 7. Moreover, such an approach—if applied in an undeviating way as Judge Scalia seems to anticipate—will result in mischievous and, in my view, unattractive outcomes. Take, for example, the following hypothetical situation: An emergency back-up system is improperly installed in a military transport plane here in the United States which will cause the plane to explode if the emergency back-up system is activated. An Air Force pilot flying the transport plane over Mexico carrying a number of civilians, family members of servicemen, negligently decides to conduct an unauthorized in-flight test of the back-up system, or even negligently decides that circumstances warrant activation of the system, and the plane explodes. The pilot's negligent act occurred in Mexico and thus an FTCA action is precluded by the foreign country exception. Clearly, however, but for the negligent installation of the back-up system in the United States the plane would not have exploded. The negligent installation was the primary cause of the plane exploding. I cannot conscience a standard which would immunize this act from being actionable or make whether it is actionable dependent on whether the pilot's decision to activate the system was negligent.[9] Arguably, Judge Scalia's standard superficially may appear more reasonable and relatively innocuous when confined to cases where the negligent acts are interrelated such as in the present case;[10] how-

---

**9.** Judge Scalia is plainly wrong to assert that my approach would result in a nonsuit if the defective back-up system was installed in Mexico and negligently activated in the United States. *See* Dissent at 127. The court, not being arbitrarily compelled to choose the last proximate operative failure to serve as a proxy for the one "unitary act or omission," would be free to take account of both the acts or omissions occurring in Mexico and the United States. The former may be barred by the foreign country exception

§ 2680(k), however, the acts or omissions occurring in the United States would not necessarily be barred.

**10.** I do not find persuasive the dissent's lament, *see* Dissent at 119, that "headquarters claims" will become routine. *See* Maj.Op. at 96–97. In any case, the potential for abuse is not, in my view, sufficient reason to preclude, in effect, all headquarters claims or to make their successful assertion dependent upon whether or not there was a subsequent operative failure which might

ever, as the foregoing hypothetical illustrates, the standard is patently unacceptable when generalized to other fact patterns. Moreover, even in cases like the present one, where separate but dependent acts are involved, it may very well be that the local actor is merely executing to the tee orders received from a distant headquarters, or that the headquarters has failed to furnish needed equipment despite pleas from the local actors. Clearly in such cases, the gravamen of the negligence is located at the headquarters and should not be insulated from liability on the basis of an arbitrary choice of law rule.

### IV. CONCLUSION

Nothing in the FTCA suggests that when several acts or omissions contribute to an injury, only one can be selected as the determinant of whether FTCA liability lies under either section 2680(k) or section 1346(b) and that one must be the most proximately operative failure to comply with standards. This is a judicial gloss, albeit a creative one, calculated by the dissent to insure a result of non-suit in complex cases where non-suit may very well not be the result most attuned to congressional intent. Although clearly a more easily administrable standard, Congress rejected use of the place of injury in FTCA—a standard which the dissent's most proximate operative failure standard closely approximates. *See Richards v. United States*, 369 U.S. at 10, 82 S.Ct. at 591. Unlike Judge Scalia, I do not believe that "the intent of Congress [in the FTCA] was to insulate the government from claims for injuries caused by its employees abroad, whether or not those employees' actions can in turn be attributed to actions or inactions by other employees stateside." *See* Dissent at 119. I simply do not believe that Congress intended by the foreign country exception to sanction the government's exportation to foreign countries of poorly trained, unsupervised, or inept per-

sonnel with free license to injure unsuspecting residents of those countries, as well as any Americans travelling abroad. Indeed, the extraordinary lengths to which the dissent must go to preclude these plaintiffs from proceeding with their FTCA claim against the government surely suggests the opposite.

---

have prevented the ultimate harm. Where legitimate headquarters claims exist, they should be actionable; where such claims are clearly frivolous or merely contrived for jurisdictional pur-

poses, district courts may dismiss the complaint or grant summary judgment. *See, e.g., Pelphrey*, 674 F.2d at 248 (discussed *supra* p. 134).